27 A.3d 175

John R. BOER, Personal Representative
of the Estate of Dorothy C. Faya

v.

UNIVERSITY SPECIALTY HOSPITAL.

No. 67, Sept. Term, 2008.

Court of Appeals of Maryland.

Aug. 19, 2011.

530

Michael J. Kelly (David A. Cagle of Kelly, Spicer & Sidle, P.A., Timonium, MD), on brief, for petitioner.

Allan B. Rabineau, Baltimore, MD, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, BARBERA, JOHN C. ELDRIDGE (Retired, Specially Assigned) and ALAN M. WILNER (Retired, Specially Assigned), JJ.

ALAN M. WILNER (Retired, Specially Assigned), J.

This case presents a very narrow legal issue, but one of first impression. Maryland Code, § 8–104(c) of the Estates and Trusts Article (ET) permits a creditor to file a claim against a decedent's estate prior to the appointment of a personal representative. Because, in such a situation, no estate has yet been opened and no Orphans' Court has therefore assumed jurisdiction, the law permits the creditor to file the claim with the register of wills in any of three counties: where the decedent was domiciled, where the decedent "resided" on the date of his or her death, or where real property or a leasehold interest in real property of the decedent is located.[1] The only legal issue before us is what is meant by "resided."

The relevant facts are undisputed. The decedent in this case, Dorothy Faya, lived for most of her 82 years at her home in Catonsville, in Baltimore County. On November 29, 2002, when she was 81 and had been living alone for some time, she suffered a fall and was taken by ambulance to St. Agnes Hospital. She remained at St. Agnes, which is located in Baltimore City, for about three weeks, until December 21, 2002. Upon her discharge, the intent was to take Ms. Faya to a nursing home in Catonsville, but, while en route, she became unable to breathe on her own, so she was taken instead to University Specialty Hospital (USH), a licensed chronic care

---

1. In this regard, and generally under the Maryland Code, Baltimore City is regarded as a county. *See* Maryland Code, Art. 1, § 14.

hospital also located in Baltimore City, and placed on artificial life support—a ventilator and a feeding tube.

With the exception of five emergency admissions to two nearby acute care hospitals, both located in Baltimore City, for brief periods—three of them for a day or less—Ms. Faya remained at USH for the next eleven months, until November 21, 2003, when she died. During her stay at USH, she remained on the ventilator and feeding tube. She was mentally competent but unable to talk.

During the first few months of her hospitalizations, Ms. Faya's hospital and medical bills were covered by Medicare. That insurance was exhausted on March 29, 2003, however. Her daughter, Deborah Boer, was advised, and, either from Ms. Faya's accounts or joint accounts of mother and daughter, Ms. Boer made three payments between May and November 2003, totaling $35,896. Counsel to USH attempted to work with Ms. Boer to have her mother qualify for Medicaid benefits, but, unfortunately, Ms. Faya died before that could be arranged. The outstanding balance due USH at the time of Ms. Faya's death was $206,343.

On December 10, 2003, prior to the opening of an estate and the appointment of a personal representative, USH filed a claim with the register of wills in Baltimore City.[2] On February 18, 2004, Ms. Faya's will was admitted to probate in Baltimore County and her son-in-law, John Boer, was appointed as personal representative. On October 1, 2004, USH filed a claim for $206,343—the actual amount owed—with the register of wills in Baltimore County. The personal representative denied the claim on the ground that it was not filed timely—within six months after the decedent's death—and that the claim filed in Baltimore City, which was timely, was invalid because, in his view, Ms. Faya did not "reside" in the City at the time of her death.

---

2. The claim filed in Baltimore City was for $210,018, nearly $3,800 more than actually was owed. That excess is not relevant to this appeal.

After an evidentiary hearing, the Orphans' Court for Baltimore County agreed with the personal representative and entered judgment for the estate. The court recognized that, under ET § 8–104(c), a creditor who files a claim prior to the appointment of a personal representative may file it with the register of wills in the county where the decedent "resided" at the time of her death. It acknowledged as well that, for purposes of that statute, "resided" means something different than domicile, and that a person may "reside" in a county other than that of his or her domicile. Nonetheless, the court found that the evidence did not support the conclusion that Ms. Faya "resided" in Baltimore City at the time of her death. It stated:

"Although she was hospitalized for approximately nine months, she never changed her mailing address to have her mail sent to the University Specialty Hospital nor did she have her clothes or personal possessions moved to the [hospital]. In fact, each time Decedent required emergency treatment or laboratory tests she was transferred to another hospital and discharged from [USH].[3] Throughout her stay at the [USH], Decedent maintained her home at the [Catonsville property] and it was her intent to return to [the Catonsville property] if possible. As a result, this Court finds that Decedent did not 'reside' in Baltimore City."

USH filed an appeal to the Circuit Court for Baltimore County, which affirmed the judgment, largely for the reasons stated by the Orphans' Court. The Circuit Court also recognized that "resided" was not synonymous with domicile but, citing *Black's Law Dictionary*, required "only bodily presence as an inhabitant of a place." It too found, however, that "the facts of this case do not support the conclusion that the

---

**3.** USH witnesses explained that, under Medicare guidelines, if a patient leaves a long-term care hospital for acute or emergency care after midnight and does not return prior to the following midnight—*i.e.*, remains away for more than 24 hours—the hospital is required to formally discharge her. That is what occurred in Ms. Faya's case. On each occasion, she was officially discharged and readmitted upon her return.

Decedent 'resided' at [USH]." The court based that conclusion on the facts that (1) Ms. Faya never changed her mailing address or had her clothes or personal possessions moved to USH, (2) each time she left for acute care elsewhere, she was formally discharged from USH, and (3) throughout her stay, she maintained her home in Catonsville and intended to return there if possible.

USH appealed to the Court of Special Appeals which, in an unreported opinion, reversed the judgment of the Circuit Court. The intermediate appellate court resolved the issue by applying traditional rules of statutory construction. By permitting a creditor, prior to the appointment of a personal representative, to file a claim in the county where the decedent "resided" at the time of her death, the Court concluded that the Legislature obviously intended that the claim could be filed in a place other than the decedent's domicile and that residence "simply requires bodily presence as an inhabitant in a given place." (quoting from *T.P. Laboratories, Inc. v. Huge,* 197 F.Supp. 860, 863 (D.Md.1961)). In the case at bar, the Court held, Ms. Faya's "bodily presence as an inhabitant of a Baltimore City health facility at the time of her death" qualified her as a resident of the City when she died.

We granted the personal representative's petition for *certiorari* to review the Court of Special Appeals decision and, for the reasons that follow, shall affirm it.

■ As a preface, we are not in accord with any implication from the Court of Special Appeals opinion that the mere fact that a person is bodily present in a particular county at the time of his or her death means, for purposes of ET § 8–104(c), that the person then "resided" in that county. If that were so, a person who dies while on vacation, or on a business trip, or during a short-term stay in a hospital could be regarded as "residing" in the county where the hotel, hospital, or other facility is located, and we do not believe that, in enacting § 8–104(c), the Legislature contemplated or intended such a result. Residence means something more than that, but to determine what, we need to look at some legislative history.

Prior to 1969, the Maryland law, in the words of the Governor's Commission to Review and Revise the Testamentary Law of Maryland, "prescribe[d] a number of detailed and archaic rules with respect to the manner of presenting claims." Second Report of the Commission, at 125 (1968). The only section of the then-current Code dealing specifically with the actual presentation of claims required that they "be exhibited against an administrator." Md.Code, Art. 93, § 119 (1957, 1964 Repl.Vol.). To remedy that collection of detailed and archaic rules, and many others as well, the Commission recommended, and the Legislature enacted, a comprehensive, substantive rewriting of Art. 93, which then comprised the State probate code. Section 8–104, as enacted in 1969, provided alternative means of presenting a claim—either directly to the personal representative or by filing it with the register of wills.

There was, however, a specific time range within which the claim had to be filed. It could not be filed *prior* to the appointment of the personal representative, nor, with limited exceptions, could it validly be filed more than six months *after* that appointment. *See* ET §§ 8–101(a) and 8–103(a).[4] Because the claim had to be filed after the personal representative was appointed, it necessarily had to be filed in the county where the estate was being administered.

That remained the law until 1989. The 1989 law that made the change was enacted as an emergency bill in order to comply with the U.S. Supreme Court's decision in *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988), which invalidated, on due process grounds, the statutes of limitations or repose, like that in Maryland, which cut off claims after a period commencing with the opening of a judicial proceeding. The Title to the bill (1989 Md. Laws, ch. 496) made clear that the principal purpose of the bill was to "alter[ ] certain time limitations on the presentation of creditor's claims against a decedent's

---

4. In 1974, as part of the ongoing code revision process, Article 93 was recodified as part of the Estates & Trusts Article.

estate," which it did principally by commencing the period of repose, alternatively, from the date of the decedent's death (initially nine months, later reduced to six months), or the date the creditor received actual notice (two months).

The amendment to § 8–104(c), which enacted the language at issue here, must be read in light of the overall purpose of the law. By commencing the period of repose from the date of the decedent's death, the statute (§ 8–103), for the first time, permitted creditors to file claims *prior* to the appointment of a personal representative and, in that circumstance, to file the claim with the register of wills in any of three possible counties—where the decedent was domiciled, where the decedent resided at the time of death, or where the decedent owned or leased real property. No one of these options was, or is, preferred over another. It is the creditor's choice.

This Court's cases dealing with *domicile* look principally to the person's subjective belief as to where his or her true home is located. If the person is physically somewhere else, the Court has given overwhelming weight to evidence that the person hopes, intends, or expects to return. *See Blount v. Boston,* 351 Md. 360, 368, 718 A.2d 1111, 1115 (1998) ("This Court has held on numerous occasions that the 'controlling factor in determining a person's domicile is his intent. One's domicile, generally, is that place where he intends it to be.' "). The objective indicia usually considered by the Court—where the person is registered to vote, the address on the person's driver's license, where the person receives mail or keeps furniture or other belongings, for example—seem to be examined less for any direct bearing on domicile and more in determining what the person's subjective belief really is and whether it is reasonable under the circumstances. *See Bainum v. Kalen,* 272 Md. 490, 499, 325 A.2d 392, 397 (1974); *Stevenson v. Steele,* 352 Md. 60, 70, n. 3, 720 A.2d 1176, 1180, n.3 (1998).

That kind of deference to the person's subjective hope or intent, which both the Orphans' Court and the Circuit Court stressed in reaching their respective conclusions, has

far less validity when determining pure residency for purposes of ET § 8–104(c). Whether, in her heart, Ms. Faya regarded Catonsville as her true home and earnestly hoped, intended, or even expected that, one day, she might be able to return there is certainly entitled to be considered as part of the broad mix of evidence relevant to where she actually "resided" when she died. Because residency under that statute is an independent alternative to domicile, however, it ultimately must be determined on the basis of objective facts beyond her subjective hope, intention, or expectation, and, if the statute is to have real meaning, residency *must be reasonably capable of determination by the creditor.* Accordingly, those subjective factors, important to a determination of domicile, necessarily have much less weight than whether, or when, the person *actually* might be able or expected to return to his or her former residence or place of domicile.

■ This was not a situation of Ms. Faya's being in a Baltimore City facility for acute care or even for a several-week or several-month period of longer-term therapy or care that, one day, would no longer require her presence there. Of critical importance in looking at the reality of her situation, the undisputed evidence was that, during the entire period of eleven months left to her, Ms. Faya was unable to be weaned off a ventilator and had to be fed through a feeding tube. The only times she left University Specialty Hospital were when she needed more acute care at other hospitals, all in Baltimore City. The fact that, because of Medicare requirements, the hospital was required to formally discharge and readmit her if she were away for more than 24 hours has no significance whatever because she was, in fact, returned to USH each time.

Here, notwithstanding what turned out to be unduly optimistic progress notes made within a few months after her arrival at USH indicating some improvement in her condition and some prospect of her returning home, the evidence at the more critical times nearer to her death eight months later was clear that, due to her unfortunate medical condition, it remained unlikely that she ever would have been able to return

to her Catonsville home. A progress note dated as early as July 3, 2003 noted that she was in the chronic ventilator unit and that "[s]he is not a candidate for weaning as she has severe end-stage COPD." Additional progress notes in the succeeding months confirmed that she was not a candidate for weaning from the ventilator unit. She obviously could not return home while she remained dependent on artificial life support and needed to be constantly monitored by trained professionals.

As an element of domicile, this Court has defined "residence" as the place where one "actually lives." *Stevenson v. Steele,* 352 Md. 60, 69, 720 A.2d 1176, 1180 (1998). The plain simple fact, given insufficient attention by the Orphans' Court and the Circuit Court, is that, in light of Ms. Faya's situation, USH was where she "actually live[d]" when she died. That *was* her dwelling, her home, her abode for eleven months—the balance of her life—and likely would have remained so even if she had lived months or perhaps even years longer. She did not die prematurely while in the course of recovery. The two trial courts effectively, and erroneously, grafted on to the concept of actual residency subjective elements of permanency that are more appropriate to determining domicile, and that is not the way the statute should be read.

■ Relying on the fact that § 19–342 of the Health–General Article refers to persons receiving care in hospitals as "patients" and § 19–343 of that Article refers to persons in "related facilities" such as nursing homes as "residents," the personal representative suggests that, in enacting ET § 8–104(c), the Legislature did not intend for persons receiving treatment in hospitals to be considered as "residents." We reject that notion. For one thing, there is no support for it in the legislative history of any of those statutes. Long-term care for medical problems, disabilities, or rehabilitation therapy may be provided by long-term acute care hospitals, chronic care hospitals, chronic disease centers, comprehensive care facilities, continuing care facilities, nursing homes, and nursing facilities. A patient in any of those facilities, depending on his

or her actual situation, may be regarded as "residing" there for purposes of § 8–104(c), or not. The definitions vary and overlap.[5]

It is neither reasonable nor practical to base a determination of whether a decedent who was a patient in any of these long-term care facilities "resided" there, for purposes of § 8–104(c), on what kind of license the facility has or whether it is called a nursing home or a chronic care hospital. Nor is it consistent with the statutory purpose. One must keep in mind that § 8–104(c) applies to *all* creditors of the decedent, not just hospitals or nursing homes seeking to recover the cost of care provided to the decedent.

How is any particular creditor, who may have little knowledge about the decedent other than that he or she died while a patient in a facility, to know whether the decedent would have

---

**5.** As an example, Md.Code, § 19–301($l$) of the Health–General Article defines "nursing facility" as "a related institution that provides nursing care for 2 or more unrelated individuals." Section 19–1401 of that same Article defines "nursing home" as "a facility (other than a facility offering domiciliary or personal care as defined in Subtitle 3 of this title) which offers nonacute inpatient care to patients suffering from a disease, chronic illness, condition, disability of advanced age, or terminal disease requiring maximal nursing care without continuous hospital services and who require medical services and nursing services rendered by or under the supervision of a licensed nurse together with convalescent, restorative, or rehabilitative services." The State Health Plan, which is a regulation of the State Department of Health and Mental Hygiene (DHMH), defines "nursing home" as "a health care facility licensed for comprehensive care beds under COMAR 10.07.02. COMAR 10.24.08.16.B(32).

The State Health Plan defines "chronic hospital" as "a facility licensed as a special hospital-chronic disease in accordance with CO-MAR 10.07.01 that serves patients who do not need acute care or care in another kind of specialty hospital, whose needs for frequency of monitoring by a physician and for frequency and duration of nursing care exceeds the requirements of COMAR 10.07.02 for care in a comprehensive care or extended care facility, and whose expected length of stay, typically exceeds 25 days." COMAR 10.24.08.16B(10). A "comprehensive care facility" is defined as "a facility licensed in accordance with COMAR 10.07.02 that admits patients suffering from disease or disabilities, or advanced age, requiring medical service and nursing service rendered by or under the supervision of a registered nurse." COMAR 10.24.08.16.B(12).

been able, within any particular time, to return to a home in another county, much less whether, at the time of her death, she hoped, intended, or expected to do so? Is the creditor to be put to the burden of discovering who her treating physicians were and asking their opinion as to whether she would be returning home soon—information that, due to health privacy laws, the physicians probably would be unable to supply? To read the statute as requiring that kind of extensive inquiry as a precondition to filing a claim in the county where the decedent died and had, in fact, lived for the preceding eleven months is wholly inconsistent with the legislative intent.

A simple investigation by a creditor in this case would reveal that Ms. Faya died while in a long-term care facility, that she had lived there for eleven months and at the time of her death was in no condition to return to her Catonsville home, and that no estate had been opened in any other county. Under ET § 8–104(c), that suffices. The filing of the claim in Baltimore City caused no prejudice to the estate or burden to the personal representative. As pointed out by Allan J. Gibber in *Gibber on Estate Administration*, 6–55 (5th ed. and 2011 Supplement):

> "Upon appointment, a personal representative has an affirmative duty to search the claims dockets in each of the counties in which a claim could have been filed, to discover if any claim was filed prior to appointment. The sooner after death appointment is accomplished, the less likely it is for claims to have been filed elsewhere."

For these reasons, the judgment of the Court of Special Appeals is affirmed.[6]

---

**6.** The dissent accuses us of making assertions not supported by the record and of giving no guidance to the public regarding the proper interpretation of the word "resided." Although we certainly disagree with the ultimate conclusion of the two trial courts, we have made no assertions of fact unsupported in the record. It is the dissent, rather, that has "cherry-picked" the parts of the record that support its argument and largely ignored the more relevant ones that destroy it. The critical determinative fact is that, whatever may have been her

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.

BELL, C.J., BATTAGLIA and ELDRIDGE, JJ., dissent.

JOHN C. ELDRIDGE (Retired, Specially Assigned), J., dissenting, in which BELL, C.J., and BATTAGLIA, J., join.

I dissent. While I agree with the majority's conclusion that the Court of Special Appeals erred by determining that a person's bodily presence in a particular county served as the main qualification for residency in that county, I believe that the majority opinion makes factual findings not supported by the record and fails to offer any instructive guidance regarding the criteria to determine what is a county of residence under Maryland Code (1974, 2011 Repl.Vol.), § 8–104(c) of the Estates and Trusts Article. Section 8–104(c) provides, *inter alia,* as follows (emphasis added):

> "If the claim is filed prior to the appointment of the personal representative, the claimant may file his claim with the register in the county in which the decedent was domiciled *or in any county in which he resided* on the date of his death . . . ."

Maryland Rule 6–413(a) contains essentially the same provision. The dispositive issue in this case concerns the meaning of the word "resided" in § 8–104(c) and Rule 6–413(a).

The majority opinion states that the "relevant facts are undisputed" in this case, but then proceeds to make a variety

---

hopes or expectations when she was first taken to USH and during the early part of her stay there, for the entire eleven months Ms. Faya was at USH, she remained on artificial life support from which, according to the medical records the dissent had chosen to ignore, she could not and would not be weaned. The dissent does not tell us how any creditor would be able to know that Ms. Faya—an 82-year old woman who had lived alone in her Catonsville home—would be able to return there while totally dependent on artificial life support and constant monitoring for her daily survival. As for guidance, this is obviously not a situation where there is a "one size fits all" universal construct. Each case is dependent on its facts. We have decided this case based on *its* facts, which is what courts are supposed to do.

of assertions that are either not supported by the record or are contrary to findings made by the Circuit Court for Baltimore County. As stated in the majority opinion, the decedent, Dorothy C. Faya, lived most of her life at 606 Stoney Lane, Catonsville, in Baltimore County, where she owned her home. She suffered a fall which led to her hospitalization at St. Agnes Hospital in Baltimore City, from November 29, 2002, until December 21, 2002, when she was transferred to the respondent, University Specialty Hospital, a chronic care facility in Baltimore City. From that time until her death on November 21, 2003, Dorothy Faya was on several occasions transferred to other Baltimore City hospitals when she required services not available at University Specialty Hospital.

Each time Dorothy Faya was transferred to another hospital, she was officially discharged from University Specialty Hospital, and there was always the chance that she would not later have been re-admitted. In hindsight, the majority opinion argues that the fact that Ms. Faya was officially discharged "has no significance" because, in the end, she always returned to University Specialty Hospital. This position, however, overlooks the fact that her return to University Specialty Hospital was never guaranteed after her discharge.[1] For every re-admission, she was assigned a new patient number. Her bed at the facility was not saved while she was away, but instead, her belongings were placed in a box and "put ... downstairs in the office ... [to] keep ... in case she came

---

1. The parties' agreed statement of facts reads as follows:
    "The various admissions during the period of time were as follows: 11–29–02 through 12–21–02, St. Agnes Hospital; 12–21–02 through 2–4–03, University Specialty Hospital; 2–4–03 through 2–8–03, Maryland General Hospital; 2–8–03 through 3–25–03, University Specialty Hospital; 3–25–03 through 3–26–03, Maryland General Hospital; 3–26–03 through 3–26–03, one day that was, University Specialty Hospital, patient admitted and discharged the same day; 3–26–03 through 3–27–03, Maryland General Hospital; 3–27–03 through 4–1–03, University Specialty Hospital; 4–1–03 through 4–2–03, University of Maryland Medical Center; 4–2–03 through 4–10–03, University Specialty Hospital; 4–10–03 through 4–15–03, Maryland General Hospital; 4–15–03 through 11–21–03, University Specialty Hospital. All of the above hospitals are located in Baltimore City."

back." Had University Specialty Hospital been fully occupied when she returned, she would not have been re-admitted. As the representative explained, "Only nursing homes have bed holds, not chronic [care hospitals.]"

The majority opinion also treats as a foregone conclusion that Dorothy Faya was never going to return to her home in Catonsville and advises lower courts to consider whether a "person *actually* might be able or expected to return to his or her former residence or place of domicile" (emphasis in original). In the present case, however, what was "actually" going to happen to Ms. Faya was unknown at time. Neither her physicians nor Ms. Faya herself ever concluded that she would be unable to leave University Specialty Hospital. The record before this Court clearly indicates that Dorothy Faya always intended to return home, and the hospital was well aware of this intent. She was competent during the period of hospitalizations, and the Circuit Court, reviewing the evidence firsthand, found that, for a variety of reasons, her only residence was her Catonsville house, which had remained unoccupied the entire time she was hospitalized.

Although Ms. Faya's ultimate discharge plan was uncertain,[2] the physician progress notes tracking Dorothy Faya's health at University Specialty Hospital indicated that she had shown "great improvement since her admission" and that she was often "feeling really fine and she [did] not have any ... discomfort."[3] She could "move[ ] ... all four limbs fairly well" and "sit[ ] comfortably in the chair by the side of the

---

2. Dorothy Faya's general admission orders to University Specialty Hospital, dated April 16, 2003, note that the goal of her stay was "[r]ehabilitation." On the admission order's checklist form, Ms. Faya's physician indicated that she was "[u]nable to determine discharge plan at present," bypassing the alternative options of "[d]ischarge to home after rehabilitation/treatment" or "[d]ischarge to long-term care facility." Tellingly, there is no option on the hospital's own form for long-term residential treatment at University Specialty Hospital.

3. The majority opinion calls these notes "unduly optimistic," but there is no indication whatsoever in the record that the remarks were undue at the time they were made. This is an extrapolation by the majority opinion not supported by the record.

bed" offering "no complaints...." The hospital staff assisted her "getting range of motion by restorative nursing." Although she remained on a ventilator and a gastric feeding tube during her stay at University Specialty Hospital, the record is silent as to whether her conditions would sufficiently improve so that she could return home or be transferred to a nursing facility.

Ms. Faya's actual cause of death is another issue obscured in the majority opinion, which states that "[s]he did not die prematurely while in the course of recovery." However, the record is actually silent on the ultimate cause and location of her death. Ms. Faya's hospital records show that staff at University Specialty Hospital commenced cardiopulmonary resuscitation on her and that she was then "sent out [to] 911 to the acute where she was unable to be resuscitated." A separate report notes that she was "transferred via 911" to "UMMS." However, where she was sent, what caused her death, and where she ultimately died is not disclosed in the record.

The doctors treating Ms. Faya never gave her the prognosis that the majority opinion now sees fit to pronounce, that Ms. Faya "obviously could not return home." Ms. Faya was receiving treatment at University Specialty Hospital and, according to her physician's progress notes, was doing quite well. The simple fact is, at the time, no one knew what the outcome of Ms. Faya's care would be. It is unreasonable, as well as a violation of Maryland Rule 8–131(c),[4] for this Court now to make findings of historical facts concerning matters which, at the time, no one knew the outcome and which the Circuit Court record does not reveal.

___

4. Maryland Rule 8–131(c) provides as follows:

"(c) **Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."

The majority opinion stresses that if § 8–104 of the Estates and Trusts Article "is to have real meaning, residency *must be reasonably capable of determination by the creditor.*" (Emphasis in original). I agree that creditors, both medical providers and others alike, should be able to ascertain the residency of the decedent. Unfortunately, the majority opinion only offers confusion where more clarity is needed. There are no guidelines established by the majority's opinion regarding what criteria this Court, the lower courts, or creditors should employ to determine an individual's residency. The majority's decision in this case hinges on the rather amorphous condition of "whether, or when, [a] person *actually* might be able or expected to return to his or her former residence or place of domicile" (emphasis in original) rather than being based on objective criteria previously applied by this Court to evaluate residency, such as mailing address, location of personal possessions, and documentary records. Foremost among the undefined criteria in the majority's opinion is what comprises the difference between a long-term residential stay at a hospital and a shorter, non-residential stay.

As a starting point, the majority opinion fails to point out that the Hospital was, at all times, aware that the decedent's home was in Baltimore County, as most of her hospital paperwork noted her residence as 606 Stoney Lane in Catonsville. Creditors did not need to conduct an extensive search for Ms. Faya's home address, as the majority opinion implies, and her home address was in no way obscured from possible creditors. The majority opinion espouses concern that creditors will be unable to locate the proper venue for filing their claims, but in this case, it could not have been clearer that the most appropriate venue was the county where her home was located and where the majority of hospital records indicated she resided, Baltimore County.

This case presents a simple matter of a creditor filing in the wrong county and not correcting its mistake until the time for filing expired. Rather than taking the optimal course of action and filing a claim in the county where the decedent's

home was located, University Specialty Hospital, on December 10, 2003, less than a month after Ms. Faya's death and prior to the decedent's estate being opened, filed a claim with the office of the Register of Wills for Baltimore City, where the Hospital itself was located, in the amount of $210,028.26, although the actual balance of the decedent's hospital bill was $206,343.12. Not until October 1, 2004, did University Specialty Hospital file a second claim in Baltimore County, where Ms. Faya's home was located. This second claim was filed after the sixth month limitation period for filing claims specified by § 8–103 of the Estates and Trusts Article.[5] Because the second claim filed in Baltimore County was late and, therefore, barred, University Specialty Hospital was forced to rely on its first claim and accordingly, brought the suit now before this Court, advancing the novel argument that Dorothy Faya "resided" in Baltimore City because of her hospital stay.

At the conclusion of its proceedings, the Circuit Court denied University Specialty Hospital's claim, finding that the decedent did not reside in Baltimore City on the date of her death. The court, while acknowledging a legal distinction between a residence and domicile, nonetheless found that the decedent's only residence on the date she died was at 606 Stoney Lane, Catonsville, in Baltimore County, which was also her domicile. The court reviewed the facts that had been complied during the hearing and noted that it was "uncontro-

---

5. Section 8–103(a) provides as follows:

"**§ 8–103. Limitation on presentation of claim.**

(a) *In general.*—Except as otherwise expressly provided by statute with respect to claims of the United States and the State, all claims against an estate of a decedent, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract, tort, or other legal basis, are forever barred against the estate, the personal representative, and the heirs and legatees, unless presented within the earlier of the following dates:

(1) 6 months after the date of the decedent's death; or

(2) 2 months after the personal representative mails or otherwise delivers to the creditor a copy of a notice in the form required by § 7–103 of this article or other written notice, notifying the creditor that his claim will be barred unless he presents the claim within 2 months from the mailing or other delivery of the notice."

verted" that Dorothy Faya "wanted to return to her" Catonsville home. Reviewing the entire record, the court found that:

"This lady was there [Baltimore City] for medical treatment only. She intended to get medical treatment, but on a temporary basis. Unfortunately, she couldn't get out of the hospital and return to her home."

As the majority opinion points out, the Circuit Court itself found that "the *facts* of this case do not support the conclusion that the Decedent 'resided' at University Specialty Hospital." (Emphasis added). The Circuit Court also pointed out that no writings indicated that the decedent intended to change either her residence or her domicile and that the application for medical assistance, prepared for Dorothy Faya by an agent or employee of the hospital, listed her residence as 606 Stoney Lane, as did numerous other documents related to her stay at the Hospital. Even the University Specialty Hospital's computer system listed the decedent's residence as 606 Stoney Lane.

The majority asserts, and I agree, that "[r]esidence means something more than" "a person who dies while on vacation, or on a business trip, or during a short-term stay in a hospital." Unfortunately, the majority fails to explain which indicia can or should be used to determine what that "something more" is. In resolving what it means to "reside" in a place, I believe this Court should consider its previous opinions on residency, which the majority opinion, in large part, ignores. Those opinions, however, indicate that an individual does not "reside" in a hospital room, especially when all of the objective criteria indicate that she "resided" elsewhere.

This Court's opinions construing and/or applying the words "reside" or "residence" in statutes and constitutional provisions generally have involved enactments where those words were construed to mean "domicile." [6] But § 8–104(c) of the

---

6. Thus, in *Blount v. Boston,* 351 Md. 360, 365, 718 A.2d 1111, 1114 (1998), quoting *Bainum v. Kalen,* 272 Md. 490, 496, 325 A.2d 392, 395–396 (1974), the Court acknowledged that we have " 'consistently held that the words "reside" or "resident" in a constitutional provision or

Estates and Trusts Article is a rare exception where the wording of the statute makes it clear that "resided" does not mean "domiciled." Instead, in this statute, "any county in which [the decedent] resided" serves as an alternative to "the county in which the decedent was domiciled."

Nevertheless, this Court's opinions concerning the words "reside" or "residence" have often construed those words to mean "domicile." The connection between the words "residence" and "domicile" is logical because a place where someone actually resides (in a non-domiciliary sense) is a major factor in determining whether the location is also that person's domicile. But even in opinions where this Court has construed "residence" to mean "domicile," the decisions lend insight as to what "reside" or "residence" means when those words do not mean "domicile."

Our opinions have treated the words "reside" or "residence," in a non-domiciliary sense, as synonymous with "dwelling," "habitation," "abode," "actual residence," "place where one lives" and "home." *See, e.g., Oglesby v. Williams,* 372 Md. 360, 373–379, 382, 812 A.2d 1061, 1068–1072, 1074 (2002) (repeatedly equating non-domiciliary "residence" with "dwelling," "habitation," "abode," "home," and place where one "actually lives"); *Blount v. Boston,* 351 Md. 360, 365–372, 379–386, 718 A.2d 1111, 1114–1117, 1121–1124 (1998) (same); *Stevenson v. Steele,* 352 Md. 60, 69–70, 720 A.2d 1176, 1180 (1998) (residence is where one "actually lives"); *Roberts v. Lakin,* 340 Md. 147, 153, 665 A.2d 1024, 1027 (1995) (" 'A person may have several places of abode or dwelling' "); *Bainum v. Kalen,* 272 Md. 490, 497, 325 A.2d 392, 396 (1974) (same). *Black's Law Dictionary,* at 1335 (8th ed.2004), defines "residence" as "[t]he act or fact of living in a given place for some time. . . . The place where one actually lives, as distinguished from

statute . . . would be construed to mean "domicile" unless a contrary intent be shown.' " Numerous cases before this Court have followed this practice. *See, e.g., Oglesby v. Williams,* 372 Md. 360, 373, 812 A.2d 1061, 1068 (2002); *Stevenson v. Steele,* 352 Md. 60, 64 n. 1, 720 A.2d 1176, 1177 n. 1 (1998); *Roberts v. Lakin,* 340 Md. 147, 153, 665 A.2d 1024, 1026 (1995).

domicile.... [B]odily presence as an inhabitant in a given place."

The common understanding of the words "inhabitant," "habitation," "dwelling," "home," "abode," and "place where one lives," would not encompass a hospital where one is taken for medical treatment because of an accidental injury, and when the injured person intends to return to her "home" as soon as hospitalization is no longer necessary. This understanding is reflected in dictionary definitions. Thus, the word "inhabitant" is defined in *Webster's Third New International Dictionary* at 1163 (1981) as "a person who dwells or resides permanently in a place as distinguished from a transient lodger or visitor...." "Habitation" is defined as "the act of inhabiting" and as "a dwelling place: HOUSE, HOME, RESIDENCE...." (*Id.* at 1017). *Webster's* defines "dwelling" as a "building ... used for residence: ABODE, HABITATION." (*Id.* at 706). "Dwelling house" is defined as a "house ... that is occupied as a residence in distinction from a store, office, or other building...." (*Ibid.*). Similarly, "abode" is defined as a "place where one ... dwells: HOME...." (*Id.* at 4). Finally, the first definitions of "home" are "the house and grounds with their appurtenances habitually occupied by a family ...," and "a private dwelling: HOUSE." (*Id.* at 1082).

The majority opinion fails to consider these definitions in deciding that Dorothy Faya's residence was University Specialty Hospital, but even more troubling, it leaves open the question of which factors contribute to a determination of an individual's residency. In evaluating residency, this Court has always considered objective indicators that get to the heart of the question of where the individual lived. A reasonable person, viewing Ms. Faya's situation, would not objectively believe that she resided at University Specialty Hospital. No one would have described it as her home or her dwelling. The normal trappings of a residence were simply not present at the hospital. Her family members did not, and could not, reside with her; she did not furnish her room besides having a few personal belonging, and she never changed her mailing address.

Even more confusing for creditors is the majority's insistence that "a several-week or several-month period of longer-term therapy or care" does not create a residence, particularly in light of the majority's failure to furnish any specifics concerning when such "longer-term therapy or care" becomes residential. Nothing in the majority decision would prevent, for example, a hospital in Baltimore City from filing a claim against a decedent's estate in Baltimore City, even if the decedent owned a home in Howard County and had merely spent a month at the Baltimore City hospital. No guidance is offered, or criteria set forth, as to what, in the majority's opinion, distinguishes a non-residential "short-term stay" from a residential stay in a hospital.

Finally, the majority opinion bases its ultimate decision on information that it rightly acknowledges would not normally be available to creditors. The majority notes that, in this case, a "simple investigation" by a creditor would reveal that "at the time of [Ms. Faya's] death [she] was in no condition to return to her Catonsville home," but then criticizes the notion that creditors should be "put to the burden of discovering who [a patient's] treating physicians [are] and asking their opinion as to whether [the patient] would be returning home soon—information that, due to health privacy laws, the physicians probably would be unable to supply." The majority's decision relies on information that it knows an average creditor would not be able to obtain. Nevertheless, a "simple investigation by a creditor in this case" would have quickly yielded the address of Dorothy Faya's Catonsville home, where the estate was opened and where claims should have been filed.

University Specialty Hospital at all times knew the address of Dorothy Faya's home. The Hospital had it listed in their records, and knew that she intended to return there. On the facts of this case, the creditor was well-aware of the decedent's residency. It is sincerely unlikely that the Hospital filed in Baltimore City because it was confused as to where Ms. Faya resided. It filed in Baltimore City for its own ease and only now relies on that claim because the appropriately filed claim in Baltimore County was barred as untimely.

A normal person's understanding of one's "residence" would exclude hospitals treating a patient's accidental injury, with the patient intending to return home as soon as hospitalization is no longer required. This is not to say that a health care facility cannot, under some circumstances, be a "residence." For example, when an elderly person is unable to care for himself or herself, and is placed in a nursing home with no intention or prospect of returning to his or her prior home, the nursing home may well be the person's new "residence." Nevertheless, in this case, a representative of University Specialty Hospital testified that "[w]e are a chronic care facility, we are not a nursing home." Moreover, it was stipulated that Dorothy Faya was competent during her hospitalizations, and the Circuit Court found that she wanted to and intended to return to her home in Catonsville.

Under the facts of this case, the Circuit Court was justified in concluding that Dorothy Faya did not "reside" at the respondent Hospital within the meaning of § 8–104(c) of the Estates and Trusts Article.

Chief Judge BELL and Judge BATTAGLIA join this dissent.