31 A.3d 94

Megan CATHEY

v.

## BOARD OF REVIEW, DEPARTMENT OF HEALTH AND MENTAL HYGIENE.

**No. 12, Sept. Term, 2011.**

Court of Appeals of Maryland.

Oct. 25, 2011.

Andrew H. Baida (Caroline L. Hecker of Rosenberg, Martin, Greenberg, LLP, Baltimore, MD), on brief, for appellant.

Mark J. Davis, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case we must determine whether a developmentally disabled adult with an interstate custody arrangement qualifies for Developmental Disability Administration ("DDA") services in Maryland. Petitioner Megan Cathey is a developmentally disabled adult whose custody traverses state lines. Pursuant to a New Jersey court order, Petitioner lives with her mother in New Jersey for two weeks a month and with father in Maryland for the remaining two weeks.

With this arrangement in mind, Petitioner's father applied for DDA services several years ago, but the Maryland Department of Health and Mental Hygiene ("Department") determined that her interstate custody did not give her the requisite Maryland residency to qualify for such services. The Department's Board of Review affirmed, and the Circuit Court for Baltimore City upheld the Board's decision.

Petitioner sought relief from this Court, and we granted *certiorari* on April 22, 2011. *See Cathey v. Bd. of Review,* 418 Md. 586, 16 A.3d 977 (2011). Petitioner presented the following question for our review:

> Is a developmentally disabled individual eligible for services provided or funded by the DDA during the time she resides with her father in Maryland in accordance with a court order granting the father joint legal and residential custody, and directing that the individual alternate her time equally with each parent in successive two-week intervals?

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

For the reasons explained below, we shall hold that the Petitioner is eligible for DDA services during the time she lives with her father in Maryland. We shall also hold that the concept of "residence" as presented in the relevant portion of the Code of Maryland Regulations is not as exacting as the legal concept of "domicile."

## FACTS AND LEGAL PROCEEDINGS

Petitioner Megan Cathey was born November 21, 1977. She is developmentally disabled, and her diagnoses have included mental retardation, neurological impairment, and bipolar disorder. She requires regular care and supervision to perform many day-to-day tasks, such as meal-planning, budgeting, and accessing community resources.

In 1990, Petitioner's parents divorced. Her father, Joe Cathey, has lived in Maryland since 1989. He lives with his wife in Maryland, and Petitioner's mother, Virginia, lives in New Jersey. The initial divorce decree gave primary residential custody of Petitioner to her mother, subject to visitation rights. In accordance with this decree, Petitioner had a monthly Wednesday–to–Sunday visit with her father.

In 2005, Dr. Charles Diament, a psychologist, was appointed by the New Jersey courts to evaluate Petitioner's custody arrangements. Dr. Diament concluded that Petitioner's parents should share "joint legal custody" and "should share physical custody on an equal basis." Dr. Diament reasoned that Petitioner "should have extensive contact with both parents."

Based on Dr. Diament's report, the Superior Court of New Jersey modified the initial divorce decree. Concluding that Petitioner's father had "shown a change in circumstances that would warrant a reevaluation of custody," the court issued a post-judgment order, effective February 25, 2006, giving Petitioner's parents joint legal and residential custody. The court ordered that Petitioner spend her time with each parent equally in alternating two-week blocks. Petitioner's parents implemented the new arrangement in March 2006. Since

then, Petitioner has alternated her time living with her father in Maryland and her mother in New Jersey.

When Petitioner is in New Jersey, she receives funding and services from the New Jersey Division of Developmental Disabilities, and she attends an Easter Seals care program. When she is in Maryland, she participates in the day program at a facility known as The Arc Carroll County, Monday through Friday. She has received no state funding in Maryland, however, and her father pays for services at the Arc. New Jersey does not pay for any of Petitioner's services while she is in Maryland.

In December 2005, Petitioner's father applied for DDA services, citing the pending revisions to the custody arrangement and the receipt of comparable services in New Jersey. Portions of both the Maryland Developmental Disabilities Law and the Code of Maryland Regulations govern such an application.

The Developmental Disabilities Law mandates that applicants receive an evaluation to determine whether they have a developmental disability or otherwise meet the eligibility requirements for services. Md.Code (1986, 2009 Repl.Vol.), § 7–404 of the Health–General Article.[1] The statute empowers the Secretary of Health and Mental Hygiene to promulgate rules and regulations governing such evaluations, *see* §§ 1–101, 7–401, 7–404, which are found in the Code of Maryland Regulations ("COMAR"), *see* COMAR 10.22.12. The regulations provide that "[t]o be eligible for services funded by the DDA as an individual with developmental disability, that individual shall: (1) Be a resident of Maryland; and (2) Have an evaluation that finds that a developmental disability is present." COMAR 10.22.12.05.A. Both parties have agreed throughout these proceedings that Petitioner has a developmental disability, as defined by the statute.

---

**1.** Unless otherwise provided, all statutory references are to the Maryland Code Health–General Article.

The focus of this dispute is whether she is a "resident" of Maryland. The relevant regulations further define a resident:

"Resident" means an individual who:

(a) Demonstrates that that individual is living in the State voluntarily with an intent to remain on a permanent basis, including children with parents or guardians who reside out of the State;

(b) Resides out-of-State but whose parents or guardians are residents of Maryland; or

(c) Is a migrant worker and, while in the State, needs medical care and is not receiving assistance from any other state or political jurisdiction.

COMAR 10.22.12.03.B(27). In response to the application by Petitioner's father, the DDA concluded in November 2006 that Petitioner was "not eligible for services funded by DDA due to the [COMAR] residency requirement."

Petitioner then appealed the decision. An administrative law judge ("ALJ") held a hearing on March 7, 2007, and then issued a proposed decision on June 4 of that year, upholding the DDA's determination. The ALJ interpreted the term "resident" in COMAR as analogous to the legal concept of a "domicile," which requires that the person voluntarily intend to live in Maryland indefinitely. *See, e.g., Blount v. Boston,* 351 Md. 360,. 718 A.2d 1111 (1998). The ALJ ruled that Petitioner had her "primary residence" in New Jersey and was therefore ineligible for benefits in Maryland.[2]

---

**2.** The ALJ so ruled because Petitioner had lived in New Jersey for an extended period of time, qualified for benefits there, and received federal benefits through her mother there. The ALJ also said that Petitioner's mother is the "primary residential custodial parent." This language, however, was taken from the original 1990 divorce decree, which was modified by the 2006 post-judgment order by the Superior Court of New Jersey, ordering that Petitioner's parents "should share physical custody on an equal basis." As we discuss *infra,* using the language from the proper divorce decree bears on whether Petitioner is a "resident" of Maryland.

Petitioner requested that the Secretary review the ALJ's proposed decision.[3] In response, the Secretary's designee affirmed the ALJ's ruling in a final decision on February 1, 2010. The final decision quoted *Blount* for the proposition that "[a]lthough a person may have several places of abode or dwelling, he or she can have only one domicile at a time." *See Blount*, 351 Md. at 367, 718 A.2d at 1115. The Secretary's designee said the principle in *Blount* "has broad application and is not subject to any exceptions" and therefore adopted the ALJ's conclusions of law and findings of fact in full.

Petitioner then appealed to the Department of Health and Mental Hygiene's Board of Review ("Board"), the Respondent in this case, which held hearings on April 22, 2010, and affirmed the Secretary's final decision on May 4, 2010. Petitioner sought judicial review in the Circuit Court for Baltimore City, which affirmed the Board's decision, holding that it was "based on substantial evidence and consistent with Maryland law. . . ." Petitioner's petition for *certiorari* followed, which we granted. *Cathey*, 418 Md. 586, 16 A.3d 977 (2011).

## STANDARD OF REVIEW

Nowhere in the Maryland Developmental Disabilities Law is the term "resident" defined. *See* § 7–101. Nor is it defined in the definition section of the Health–General Article. *See* § 1–101. The statute is generally silent on eligibility for disability services; instead, it authorizes the Department Secretary to promulgate appropriate regulations. *See* § 7–401, et seq. The definition of "resident" thus appears in COMAR 10.22.12.03.B(27), and in this case, the Department interpreted its own regulations to provide that "resident" is akin to the well-established concept of a "domicile." We are therefore tasked with reviewing the Department's interpretation of its own regulation.

---

**3.** Md. Health Gen. Section 7–406(a)(2) allows applicants for DDA services to "request the Secretary to review the decision of the informal hearing."

In reviewing the Department's decision, we must consider several principles. For cases in which an agency interprets its own regulations, we have held that "questions of law are completely subject to review by the courts," and that this Court "is not bound by the agency's legal conclusions; we are, in short, under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law." *Dep't of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 118, 771 A.2d 1051, 1057 (2001) (quotations omitted). We have also indicated, however, that an agency's interpretation of its own regulations is entitled to some deference. "Because an agency is best able to discern its intent in promulgating a regulation, the agency's expertise is more pertinent to the interpretation of an agency's rule than to the interpretation of its governing statute." *Comm'n on Human Relations v. Bethlehem Steel Corp.,* 295 Md. 586, 593, 457 A.2d 1146, 1150 (1983). This deference, though, has limits. "Deference to the interpretation of the agency, however, does not mean acquiescence or abdication of our construction responsibility. Despite the deference, it is always within our prerogative to determine whether an agency's conclusions of law are correct." *Adventist Health Care, Inc. v. Health Care Comm'n,* 392 Md. 103, 121, 896 A.2d 320, 331 (2006). The decision to interpret "resident" as "domicile" is a conclusion of law, so we shall therefore consider whether the agency was erroneous in its decision making.

## DISCUSSION

In interpreting an agency's conclusions of law, we must also consider our principles regarding remedial statutes. As the Board conceded at oral argument, the Maryland Developmental Disabilities Law is a remedial statute.[4]

---

**4.** This Court defined remedial statutes in *Langston v. Riffe,* 359 Md. 396, 408–09, 754 A.2d 389, 395–96 (2000):

> Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries. They also include statutes intended for the correction of defects, mistakes and omissions in the civil

Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries. . . . The definition of a remedial statute has also been stated as a statute that relates to practice, procedure, or remedies and does not affect substantive or vested rights.

*    *    *

3 Norman J. Singer, Sutherland's Statutory Construction, supra, § 60.02, at 152; see also 2 id. § 41.09, at 399 ('The statutes which fall into this category [of remedial statutes] are ones that describe methods for enforcing, processing, administering, or determining rights, liabilities or status.'). (Quotations omitted.)

*Pak v. Hoang,* 378 Md. 315, 324–25, 835 A.2d 1185, 1190–91 (2003). We have repeatedly held that remedial statutes are to be construed "liberally" in favor of claimants, to suppress the evil and advance the remedy. *See, e.g., Lark v. Montgomery Hospice, Inc.,* 414 Md. 215, 228, 994 A.2d 968, 976 (2010); *Haas v. Lockheed Martin Corp.,* 396 Md. 469, 495, 914 A.2d 735, 750–51 (2007); *Montgomery County Bd. of Educ. v. Horace Mann Ins. Co.,* 383 Md. 527, 544, 860 A.2d 909, 919 (2004). The "evil" in this context is the disability that causes Cathey to be unable to live independently, and the "remedy" is the services that are provided by the state to assist the disabled adult.

---

institutions and the administration of the state. The definition of a remedial statute has also been stated as a statute that relates to practice, procedure, or remedies and does not affect substantive or vested rights.

Every statute that makes any change in the existing body of law, excluding only those enactments which merely restate or codify prior law, can be said to "remedy" some flaw in the prior law or some social evil.

*    *    *

The appellate courts of this state have also defined remedial [statutes]. For instance, we [have] said that an act is remedial in nature when it provides only for a new method of enforcement of a preexisting right. Under Maryland law, statutes are remedial in nature if they are designed to correct existing law, to redress existing grievances and to introduce regulations conducive to the public good.

■ Here, the Secretary is given the power under the statute "to adopt rules and regulations" establishing evaluation procedures for developmentally disabled adults. *See* § 7–401. Exercising this authority, the Secretary adopted the regulation requiring that an individual be a resident in order to qualify for the services, defining resident status as set forth above. We have previously held that statutes "are remedial in nature if they are designed to ... introduce regulations conducive to the public good." *Pak*, 378 Md. at 325, 835 A.2d at 1190 (2003) (quotations omitted); *see Doe v. Roe*, 419 Md. 687, 703, 20 A.3d 787, 797 (2011); *Langston v. Riffe*, 359 Md. 396, 408–09, 754 A.2d 389, 395–96 (2000). If statutes are remedial because they authorize regulations conducive to the public good, then manifestly we should interpret those regulations liberally as well, to "suppress the evil and advance the remedy." *See Lark*, 414 Md. at 228, 994 A.2d at 976; *see also Carven v. State Ret. & Pension Sys.*, 416 Md. 389, 416, 7 A.3d 38, 55 (2010) (Murphy, J., dissenting) ("Because the ambiguous COMAR regulation at issue applies to a remedial statute, the regulation should be liberally construed in favor of the claimant."). The ALJ interpreted "resident" as used in COMAR to be synonymous with "domicile," as that term is interpreted under common law. The ALJ ruled that because Petitioner is not domiciled in Maryland, she is therefore not eligible for DDA benefits. The ALJ held that residence "requires the *voluntary* intent to make Maryland a *permanent* home," adding that although Petitioner "is a Maryland resident for two weeks out of every month, there is no evidence that she is either voluntarily or permanently residing in Maryland." This initial ruling has hounded Petitioner throughout multiple affirmations on review. Because there are no disputes of fact, we shall review the ALJ's decision as a matter of law.

The Board urges us to apply the principle from *Bainum v. Kalen* that "the words 'reside' or 'resident' in a constitutional provision or statute delineating rights, duties, obligations, privileges, etc., would be construed to mean 'domicile' unless a contrary intent be shown." *See Bainum v. Kalen*, 272 Md. 490, 496, 325 A.2d 392, 396 (1974). In *Bainum*, the Petitioner

was ruled ineligible to run for the Maryland Senate because he was not domiciled in Maryland under a state constitutional provision requiring him to have "resided" in Maryland for three years before the election. *See id.* at 493, 501, 325 A.2d at 394, 398. A very recent case by this Court, however, illustrates the principle that "residence" and "domicile" are distinct concepts. In *Boer v. Univ. Specialty Hosp.*, this Court determined that "residency" under a statute was not synonymous with "domicile." Determining residency required analysis of objective indicia without the requisite subjective intent inherent in determining domicile. *See Boer,* 421 Md. 529, 27 A.3d 175 (2011). The *Boer* Court considered the term "reside" to be part of the domicile calculus, but not an equivalent term. *Id.* ("As an element of domicile, this Court has defined 'residence' as the place where one 'actually lives.' ").

As we interpret the regulation, moreover, we bear in mind that the legislature omitted any use of the term "resident." Rather, it spoke more generally—for example, saying that the statute is intended to "protect ... individuals with developmental disability *in this State,*" § 7–102(1) (emphasis added), and that there is a need for the Department to "coordinat[e] ... services with other public and private agencies that have responsibility for serving" such individuals, § 7–305(2). The word "resident" is introduced in the regulations issued by the Department. *See* COMAR 10.22.12.03.B(27). To be sure, the Department has the authority to issue these regulations, and to use the term "resident" in these regulations to effectuate the goals of the statute to "protect individuals with developmental disability *in this state.*" *See* § 7–102 (emphasis added).

■ Yet in construing the regulations, our guidepost is what the legislature intended. We have previously declined to construe the word "in," referring to this State, as imposing a domicile requirement. We held that "there is no principle, of which we are aware, that the word 'in' should be construed as 'domicile.' " *See Gosain v. County Council,* 420 Md. 197, 209,

22 A.3d 825, 832 (2011). In that case, we addressed standing to challenge a final administrative zoning decision. Judge Eldridge, speaking for the Court, declared: "Whatever the Legislature meant by the phrase 'any person or taxpayer in Prince George's County,' it did not mean 'domicile.'" *Id.* We acknowledged, in *Gosain,* prior holdings that the "words 'reside' or 'resident' in a constitutional provision or statute delineating rights, duties, obligations, privileges, etc., would be construed to mean 'domicile' unless a contrary intent be shown." *Id.* (quoting *Bainum,* 272 Md. at 496, 325 A.2d at 396). Yet, we distinguished *Bainum* by observing that because the statute did not use the word "reside," it would be inappropriate to use domicile analysis. Instead, we turned to the statutory wording to determine that the lawmakers "contemplated a broad category of persons or entities having standing." *Id.*

The situation in this case is not *perfectly* analogous to *Gosain,* because there we were not interpreting a regulation using the term "resident," as we are here. Yet in interpreting what "resident" means in this regulation, it is still appropriate to look to the purpose of the statute. Again turning to the language of the Developmental Disabilities Law, the goal of broadly protecting disabled persons is conspicuous:

To advance the public interest, it is the policy of this State:

(1) To promote, protect, and preserve the human dignity, constitutional rights and liberties, social well-being, and general welfare of individuals with developmental disability in this State;

(2) To encourage the full development of the ability and potential of each individual with developmental disability in this State, no matter how severe the individual's disability;

(3) To promote the economic security, standard of living, and meaningful employment of individuals with developmental disability;

(4) To foster the integration of individuals with developmental disability into the ordinary life of the communities where these individuals live;

(5) To support and provide resources to operate community services to sustain individuals with developmental disability in the community, rather than in institutions;

*    *    *

(8) To provide appropriate social and protective services for those individuals with developmental disability who are unable to manage their own affairs with ordinary prudence[.]

§ 7–102. We also bear in mind that we live in a mobile society, one in which divorce rates and parental separations are high, and persons readily move across state lines for jobs or social reasons. Were we to construe the statute as excluding coverage for disabled adults or children who live alternatively with one parent or the other, in different states, our construction would create impediments to the social and economic welfare of these disabled persons, many of whom—such as Petitioner—lack the ability to determine for themselves a choice of residency or domicile and are dependent on the courts, their parents, or other custodians to resolve such decisions.

■ With such sweeping policy goals, and considering that the statute and its related regulations are to be construed liberally, we conclude it is inappropriate to use the restrictive domicile analysis to determine "residence" under COMAR 10.22.12.03.B(27). A better way to "advance the remedy" here is to use a concept previously explained by this Court, defining "residence" as the place where one "actually lives." *Boer*, 421 Md. 529, 27 A.3d 175 (2011) (citing *Stevenson v. Steele*, 352 Md. 60, 69, 720 A.2d 1176, 1180 (1998)). The record makes clear that Petitioner actually lives with each parent in successive, alternating, two-week blocks.[5] In a typical month, Petitioner actually lives in New Jersey when with her mother and

---

**5.** As we indicated *supra,* the ALJ's proposed decision was based at least in part on the notion that Petitioner's mother is the "primary residential custodial parent." That language was from the initial divorce decree, which was superseded by a post-judgment order issued by the New Jersey court. The post-judgment order adopted Dr. Diament's opinion that Petitioner's parents "should share joint legal custody" and "should share physical custody on an equal basis." Although it does not affect our holding, we observe that the ALJ's analysis on this particular point is not supported by substantial evidence. *See, e.g.,*

in Maryland when with her father. Applying COMAR, we hold that for purposes of the Developmental Disabilities Law, Petitioner is a "resident" of Maryland during the time she spends with her father in this State, as ordered by the Superior Court of New Jersey. As such, Petitioner is eligible for DDA services during these periods. We need not determine Petitioner's *domicile* in this case. Nor need we alter or revisit the well-settled concept under Maryland law that a person may have only one domicile. The concept of multiple *residences* is consistent with Maryland law,[6] and this principle can address the increasingly complex nature of joint custody and related arrangements. For the DDA benefits at issue, it is possible for a developmentally disabled individual to have multiple residences and obtain benefits accordingly.[7]

---

*Schwartz v. Md. Dep't of Natural Resources*, 385 Md. 534, 553–54, 870 A.2d 168, 180 (2005) ("When an agency decision encompasses a mixed question of law and fact, we review it under the 'substantial evidence' standard.").

6. The Court of Special Appeals previously held that an entity "could not create its own definition of residency for tuition classification purposes that was not generally grounded in the traditional legal standards." *Bergmann v. Bd. of Regents*, 167 Md.App. 237, 276–77, 892 A.2d 604, 627 (2006) (citing *Frankel v. Bd. of Regents*, 361 Md. 298, 314, 761 A.2d 324, 332 (2000)). Those "traditional legal standards" declare a limit of one domicile per person, but still recognize that multiple residences are conceivable. *See, e.g., Bainum v. Kalen*, 272 Md. 490, 497, 325 A.2d 392, 396 (1974) ("A person may have several places of abode or dwelling but he can have only one domicile at a time." (quotations omitted)). Our holding in this case, as it deals with a remedial statute, has no bearing on cases interpreting residency requirements that allow students to qualify for in-state tuition rates.

7. We are convinced that there is no danger here of double benefits being awarded. Maryland DDA benefits should only be extended during the time Petitioner is living with her father in Maryland. New Jersey's equivalent DDA agency has already evaluated Petitioner and has agreed to pay benefits only during the time she is in New Jersey. The post-judgment order clearly delineates when Petitioner is to be where, which in effect eliminates the danger of improper duplicate benefits.

Additionally, we recognize the practical problems that might arise from denying benefits to an otherwise-eligible applicant who spends 50 percent of her time in this state. Such a denial might prompt other

Furthermore, the ALJ's conclusion of law regarding the subjective intent [8] of a domiciliary are particularly inapt in the case of a developmentally disabled individual, as suggested earlier in this opinion. The ALJ stated that Petitioner is not a resident in part because "there is no indication whether [she] can even formulate the intent to remain in Maryland permanently." This rationale simply should not bear on the "residence" of a developmentally disabled individual. If such individuals cannot form the subjective intent to change their residences, then the lack of such intent should not be brought to bear on the question of where they reside.

The Board also directs our attention to the final decision by the Secretary, which uses the definition of "resident" in CO-MAR dealing with Medicaid eligibility: "[T]he state of residence for an individual placed by a state government in another state is the state that arranges or makes the placement for medical or other publicly funded services." COMAR 10.09.24.05–3(I)(4). The Board argues that these Medicaid eligibility provisions preclude Petitioner from receiving Medicaid benefits in Maryland, and that even if she could receive them, the scarcity of State dollars means she "is unlikely to receive the DDA benefits she seeks within the foreseeable future." We are unpersuaded by both arguments.

First, the Medicaid regulations are beyond the scope of this appeal. As Petitioner correctly notes, "there are only two eligibility criteria for the DDA services which [Petitioner] has requested—that the individual have a developmental disability and live in Maryland. Neither the Maryland Developmental Disabilities Law nor the Secretary's regulations condition a

---

states to similarly deny benefits for the other 50 percent. This would leave an otherwise-qualifying individual who splits time between two states ineligible in both, despite pressing need for disability services.

**8.** Subjective intent is a necessary part of domicile analysis. *See Boer,* 421 Md. 529, 27 A.3d 175 (2011) ("This Court's cases dealing with domicile look principally to the person's subjective belief as to where his or her true home is located. If the person is physically somewhere else, the Court has given overwhelming weight to evidence that the person hopes, intends, or expects to return.").

developmentally disabled individual's eligibility for services on [additional Medicaid requirements]."

■ Second, the Board's gloomy forecast for Petitioner's prospects of actually receiving DDA funding or services simply has no bearing on her eligibility for them, as defined by the statute and the regulations. The fiscal difficulties facing the DDA do not change our interpretation of the statute or regulation. This argument is further weakened by the retroactive implications of our holding. Bearing in mind the remedial nature of the Developmental Disabilities Law and its related regulations, we hold that Petitioner is entitled to whatever benefits she would have received had her initial application for services, which was denied in November 2006, been granted. Her case must be treated as if the *initial* application were approved, and the agency shall restore Petitioner to the position she would have been in but for the erroneous eligibility determination.

## CONCLUSION

For the reasons stated above, we reverse the judgment of the Circuit Court for Baltimore City. We remand this case to the circuit court with instructions that the case be returned to the Board, and that the Board enter an Order determining that Petitioner, when residing in Maryland, is eligible for DDA services as of the date of the post-judgment order by the Superior Court of New Jersey.

**JUDGMENT OF CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO REMAND CASE TO BOARD OF REVIEW AND HAVE BOARD ENTER ORDER GRANTING PETITIONER'S ELIGIBILITY; COSTS TO BE PAID BY RESPONDENT.**