69 A.3d 426

**Daryl JONES**

v.

**ANNE ARUNDEL COUNTY, Maryland, et al.**

**No. 32, Sept. Term, 2012.**

Court of Appeals of Maryland.

July 1, 2013.

388

Linda M. Schuett (Linowes and Blocher, LLP, Annapolis, MD), on brief, for Appellant/Cross–Appellee.

David A. Plymyer, Deputy County Attorney (Jonathan A. Hodgson, County Attorney, and William C. Dickerson, Senior Assistant County Attorney of Anne Arundel County Office of Law, Annapolis, MD), on brief, for Appellees/Cross–Appellant.

Argued before BELL, C.J., HARRELL, BATTAGLIA, ADKINS, BARBERA, McDONALD, IRMA S. RAKER, (Retired, specially assigned), JJ.

BATTAGLIA, J.

 Our decision of the present case depends upon whether "residence," in a provision of the Anne Arundel County Charter, means a place of abode or domicile. A place of abode includes any dwelling or place where one sleeps, *Boer v. University Specialty Hospital*, 421 Md. 529, 538, 27 A.3d 175, 180 (2011), and merely requires "actual physical presence," *Bainum v. Kalen*, 272 Md. 490, 496, 325 A.2d 392, 395 (1974), while domicile is the particular permanent home of an individual, "to which place he has, whenever he is absent, the intention of returning." *Shenton v. Abbott*, 178 Md. 526, 530, 15 A.2d 906, 908 (1940). A domicile serves as an individual's residence for "voting, income tax returns, driver's license, motor vehicle registration, school attendance, receipt of mail, banking, contracts and legal documents, the keeping of personal belongings, [and] membership in organizations[.]" *Blount v. Boston*, 351 Md. 360, 367–68, 718 A.2d 1111, 1115 (1998). An individual may have several abodes, but he or she may have but one domicile. *Shenton*, 178 Md. at 530, 15 A.2d at 908.

The section of the Anne Arundel County Charter at issue provides:

(c) **Change of Residence.** If any member of the County Council during his term of office shall move his residence from the councilmanic district in which he resided at the time of his election, his office shall be forthwith vacated; but no member of the County Council shall be required to vacate his office by reason of any change in the boundary lines of his councilmanic district made during his term.

Based upon this provision, the Anne Arundel County Council, Appellee, enacted a bill that provided that Daryl Jones, Appellant, forfeited his elected councilmanic position. The County Council reasoned that Jones "move[d] his residence from the councilmanic district in which he resided at the time of his election" to a correctional facility in South Carolina, after having been convicted of failing to file a federal tax return.

Jones, thereafter, in the Circuit Court for Anne Arundel County challenged the authority of the County Council to

expel him as a member based upon its interpretation of "residence" as a temporary place of abode. The Circuit Court granted summary judgment in favor of the County and County Council, concluding that the County Council had the authority to declare Jones's seat vacant under the Express Powers Act, Section 5(S), Article 25A of the Maryland Code [1] and that the County Council properly interpreted "residence" under Section 202(c) as a temporary place of abode. Jones appealed and, prior to a decision in the Court of Special Appeals, filed a Petition for Writ of Certiorari, which we granted. 427 Md. 62, 46 A.3d 404 (2012). Jones presents two questions for our consideration:

1. Whether the County Council for Anne Arundel County may remove Jones from his seat as an elected official (a) for conviction of a misdemeanor when there is no local law in effect to govern the removal of a Councilmember for conviction of a crime and Section 2 of Article XV of the Maryland Constitution does not allow for removal under the circumstances presented here or (b) for Jones' inability to perform all of the daily duties of office for a period of five months

---

1. Section 5(S) of Article 25A, Maryland Code (1957, 2011 Repl.Vol.) provides:

> The following enumerated express powers are granted to and conferred upon any county or counties which hereafter form a charter under the provisions of Article XI-A of the Constitution, that is to say:
>
> (S) *Amendment of Country Code*
>
> To pass any ordinance facilitating the amendment of the county charter by vote of the electors of the county and agreeable to Article XI-A of the Constitution.
>
> The foregoing or other enumeration of powers in this article shall not be held to limit the power of the county council, in addition thereto, to pass all ordinances, resolutions or bylaws, not inconsistent with the provisions of this article or the laws of the State, as may be proper in executing and enforcing any of the powers enumerated in this section or elsewhere in this article, as well as such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county.
>
> Provided, that the powers herein granted shall only be exercised to the extent that the same are not provided for by public general law[.]

All subsequent references to the Express Powers Act shall be to Section 5 of Article 25A, Maryland Code (1957, 2011 Repl.Vol.).

when there is no local law that allows a Councilmember to be removed from office on this ground and local law with respect to the County Executive and Councilmembers called to active military duty allows a vacancy to be declared only if the elected official is unable to perform the daily duties of office for a period of six months.

2. Whether the County Council for Anne Arundel County may remove Jones from his seat as an elected official for conviction of a crime or for an inability to perform all of the daily duties of office by interpreting a Charter residency requirement to mean "place of abode," rather than "domicile," when this Court has held for more than 100 years that a residency requirement in the context of qualifications for political office means "domicile" and, specifically, that a similar residency requirement in the Baltimore City Charter means "domicile."

In response, the County and County Council filed an Answer to Petition for Writ of Certiorari and Conditional Cross–Petition, which we also granted, 427 Md. 62, 46 A.3d 404 (2012), to consider the following question:

Does the Clean Hands Doctrine bar the Petitioner's claims for relief seeking removal of the incumbent member of the County Council who now represents the First Councilmanic District from office and restoration of the Petitioner to office for the remainder of the term that expires in December 2014?

We shall hold that the County Council did not have the authority, under Section 5 of the Express Powers Act, to declare Jones's seat vacant and that "residence" in Section 202(c) embodies the notion of domicile, such that Jones did not "move his residence" by virtue of his five-month incarceration. We finally shall hold that the clean hands doctrine does not bar Jones's claim.

In 2006 and again in 2010, Daryl Jones was elected to serve as a member of the Anne Arundel County Council for the First Councilmanic District. In November of 2011, however, Jones pled guilty pursuant to a plea agreement in federal

district court to one count of willful failure to file income tax returns, in violation of Section 7203 of Title 26 of the United States Code, and was sentenced to a 5 month term, commencing on January 23, 2012, in a federal correctional facility in South Carolina.

In December of 2011, pursuant to the advice of the County Attorney, Councilmember Benoit of the Anne Arundel County Council introduced Bill 85–11 and Councilmember Grasso introduced Resolution 65–11, which declared that Jones's seat would be vacated, according to Section 202(c) of the Charter, "on the date that Councilman Jones begins 'residence' in a federal correctional facility that is located outside of Councilmanic District I." [2] The Bill and Resolution were scheduled to be considered by the County Council on January 17, 2012.

---

2. Bill 85–11 provided:
 AN EMERGENCY ORDINANCE concerning: County Council Vacancy in Councilmanic District I of Anne Arundel County
 FOR the purpose of declaring the existence of a vacancy in Councilmanic District I of Anne Arundel County.
 WHEREAS Councilman Daryl D. Jones was elected in 2006 to a four-year term as the Councilman for Councilmanic District I and reelected to a second four-year term in 2010; and
 WHEREAS the second term for Councilman Jones would ordinarily end in 2014; and
 WHEREAS Councilman Jones has been convicted of a misdemeanor and sentenced to a five-month term in a federal correctional facility scheduled to begin no later than January 23, 2012; and
 WHEREAS Section 404 of the Charter for Anne Arundel County contains a provision that allows a super majority of the County Council to declare the position of the County Executive to be vacant if the County Executive is convicted of certain crimes; and
 WHEREAS there is no similar provision in the County's Charter relating to the removal of a Councilmember convicted of a crime; and
 WHEREAS Section 201 of the County's Charter requires each member of the County Council to reside in the Councilmanic District during his full term of office; and
 WHEREAS Section 202(c) of the Charter provides that if a member of the County Council moves his residence from the Councilmanic District, "his office shall be forthwith vacated;" and
 WHEREAS the County Attorney for Anne Arundel County has advised the County Council that Councilman Jones's office as councilmember shall be "forthwith vacated as a matter of law" on the date that Councilman Jones begins "residence" in a federal correctional facili-

On January 4, 2012, Jones filed a three-count Complaint for Declaratory, Injunctive, and Other Relief in the Circuit Court for Anne Arundel County. In Count One, Jones sought a

ty that is located outside of Councilmanic District I because "residence" as used in Section 202(c) of the Charter "does not refer to a member's domicile" and instead has "its ordinary connotation of actually living within the district;" and

WHEREAS the County Attorney for Anne Arundel County has advised the County Council that it must fill Councilman Jones's seat in accordance with the vacancy provisions contained in Section 205(c) of the Charter; and

WHEREAS, Section 205(c) of the Charter mandates that the Council fill the vacancy within 30 days after the vacancy occurs; now therefore,

SECTION 1. *Be it enacted by the County Council of Anne Arundel County, Maryland,* That the County Council declares the existence of a vacancy in Councilmanic District I of Anne Arundel County on the date that Councilman Jones reports to a correctional facility located outside of Councilmanic District I, with the vacancy to be filled in accordance with Section 205 of the Charter for Anne Arundel County.

SECTION 2. *And be it further enacted,* That this Ordinance is hereby declared to be an emergency ordinance and necessary for the immediate preservation of the public peace, health, safety, welfare, and property and being passed by the affirmative vote of five members of the County Council, the same shall take effect from the date it becomes law.

Resolution 65–11, which also sought to declare Jones's seat vacant, contained language that largely mirrored the language of Bill 85–11, except that it also provided that Section 202(c) would require a councilmember to "maintain both his or her legal domicile and also general place of abode within the Councilmanic District he or she represents[.]" It also provided, in place of Sections 1 and 2 of Bill 85–11, the following:

*Resolved by the County Council of Anne Arundel County, Maryland,* That the County Council finds as a matter of law that Councilman Daryl Jones of Councilmanic District I shall be in violation of the requirements of the Anne Arundel County Charter, Section 202(c) on the date he begins his period of incarceration in a federal correctional facility outside his district for violations of federal law.

*Be it Further Resolved by the County Council of Anne Arundel County, Maryland,* that the County Council declares that a vacancy will exist in Councilmanic District I of Anne Arundel County on the date that Councilman Jones reports to a correctional facility located outside of Councilmanic District I, with the vacancy to be filled in accordance with Section 205 of the Charter for Anne Arundel County; and be it further

Resolved that a copy of this Resolution be sent to the County Executive.

Resolution 65–11 was withdrawn when Bill 85–11 was adopted.

declaratory judgment that "(A) Councilman Jones' temporary absence from Councilmanic District I does not constitute a change in residence under Section 202(c) of the Anne Arundel County Charter and (B) his office as a Councilman does not become vacant by virtue of the temporary absence." Counts Two and Three reiterated the substance of Count One, and included requests for injunctive relief and mandamus to prevent the declaration of a vacancy of Jones's seat and the removal of Jones from office. On January 17, 2012, the County Council, with Jones abstaining, voted to adopt Bill 85–11. Peter I. Smith was later appointed to fill the vacancy for the First Councilmanic District.

Thereafter, on January 25, 2011, Jones filed a Motion for Summary Judgment and for the Entry of Expedited Declaratory Relief, alleging that the County Council lacked the authority to declare his seat vacant and misinterpreted "residence" to mean place of abode rather than domicile. The County and County Council also filed a Motion for Summary Judgment as to all counts, arguing that the removal of Jones from his council seat was a nonjusticiable political question and, nonetheless, that the County Council was authorized to remove Jones pursuant to Section 5(Q) of the Express Powers Act, which provides that the County Council may enact local laws "to govern the conduct and actions of all such county officers in the performance of their public duties, and to provide for penalties, including removal from office, for violation of any such laws or the regulations adopted thereunder." In answering Jones's summary judgment motion, the County and County Council raised the "clean hands" defense to Jones's allegations, contending that Jones committed "fraud perpetrated upon the voters of the First Councilmanic District of Anne Arundel County [because he] deliberately withheld information about his criminal behavior and pending plea agreement with the United States Attorney because he knew that such information would have a material effect on the election held on November 2, 2010."

The Circuit Court Judge denied Jones's Motion, but granted the County and County Council's Motion. The Circuit Court

rejected the County Council's argument that its authority to remove Jones was derived from Section 5(Q), which provides the County with the power to "enact local laws designed . . . to provide for penalties, including removal from office, for violation of any such laws or the regulations adopted thereunder," because this provision "merely delegate[s] to the County Council the power to enact local laws." The judge, nonetheless, determined that the removal was authorized by the General Welfare Clause of the Express Powers Act, Section 5(S), which provides that the Act shall not limit the County's power "to pass all ordinances . . . as may be deemed expedient in maintaining the peace, good government, health and welfare of the county," and based on a need to avoid vacancies on the County Council that would "deadlock" votes regarding "important tasks in front of [the Council] when it holds its legislative session in May."

In so doing, the court concluded that the County Council acted within its authority because Jones "move[d] his residence," under Section 202(c) of the Anne Arundel County Charter, when he reported to the correctional facility in South Carolina, even though his domicile remained in the First Councilmanic District, because "residence" equates to a place of abode. Thus, the Circuit Court denied Jones's Motion for Summary Judgment, which sought a declaratory judgment, and granted the County and County Council's Motion for Summary Judgment as to all counts.

Before us, Jones challenges as error the Circuit Court's conclusion that the County Council had the authority to expel him from office under the General Welfare Clause, Section 5(S) of the Express Powers Act, because this provision does not empower the County Council to enact a specific expulsion of a sitting member. He also contends that the Circuit Court should have heeded our longstanding jurisprudence defining "residence" as domicile.

The County and County Council counter that the removal of a councilmember, for the failure to meet the qualifications of his or her office, is within the exclusive purview of the County

Council and is, thereby, a political question from which this Court must abstain. They reason that this exclusive power comes from Section 5(Q) of the Express Powers Act, which provides the County with the sole authority to "enact local laws designed ... to govern the conduct and actions of all such county officers in the performance of their public duties, and to provide for penalties, including removal from office, for violation of any such laws or the regulations adopted thereunder."

They alternatively contend that, if not a political question, the County Council's action was taken pursuant to Section 5(Q) of the Express Powers Act, as opposed to the provision that the Circuit Court held to provide the County Council's authority, Section 5(S), the General Welfare Clause. They contend that the Circuit Court was correct in its interpretation of "residence" in Section 202(c) of the Anne Arundel County Charter to mean a place of abode, rather than domicile, and point to a comment written by the Reporter and Counsel to the Charter Board, the drafters of the original Proposed Anne Arundel County Charter, which stated that the purpose of Section 202(c) was to "require[ ] that each councilmanic district shall be represented in the Council by a member who actually resides therein during his full term." "Actually resides," they contend, means the place of abode where the councilmember sleeps and is physically present.

■ As a threshold matter, the County and County Council contend that under the political question doctrine, the Court must abstain from intervening in the removal of a councilmember. They maintain that the County Council has the sole authority to judge the qualifications of a councilmember, citing Section 5(Q)(1) of the Express Powers Act, which provides the County with the power to

enact local laws designed to prevent conflicts between the private interests and public duties of any county officers, including members of the county council, and to govern the conduct and actions of all such county officers in the performance of their public duties, and to provide for penalties,

including removal from office, for violation of any such laws or the regulations adopted thereunder.

The Circuit Court rejected this very argument and concluded that Section 5(Q)(1) "merely delegate[s] to the County Council the power to enact local laws" and that there was no provision of the Anne Arundel County Code pertaining to the removal of councilmembers.

The political question doctrine embodies judicial abstention and depends on the notion that an issue is solely "committed to an elected branch of government and thus should not be heard in ... court." *James R. May, AEP v. Connecticut and the Future of the Political Question Doctrine,* 121 Yale L.J. Online 127 (2011), *available at* http://yalelawjournal.org/2011/09/13/may.html; *see also Nixon v. United States,* 506 U.S. 224, 252–53, 113 S.Ct. 732, 747–48, 122 L.Ed.2d 1, 24 (1993) (Souter, J., concurring) ("[T]he political question doctrine is essentially a function of the separation of powers, existing to restrain courts from inappropriate interference in the business of the other branches of Government, and deriving in large part from prudential concerns about the respect we owe the political departments." (Internal citations and quotation marks omitted)).

The existence of politics in a case, however, does not define whether a case involves a political question. *INS v. Chadha,* 462 U.S. 919, 942–43, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317, 339 (1983) ("It is correct that this controversy [involving the congressional authority to veto a determination that an individual should not be deported] may, in a sense, be termed 'political.' But the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine."). In *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663, 685–86 (1962), the Supreme Court outlined the essential aspects of a political question:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political

department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

In a case close to point, *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the United States House of Representatives expelled Congressman Adam Clayton Powell, Jr., based in part on his misuse of government funds. Powell challenged the constitutionality of the expulsion, which the Speaker and other members of the House of Representatives contended to be a political question, because, they alleged, Section 5 of Article I of the United States Constitution,[3] was a "textually demonstrable" commitment to that body to adjudicate the qualifications of its members. Powell acknowledged that Section 5 committed to the House of Representatives the duty to judge the qualifications of its members, but countered that it empowered Congress to "exclude him only if it found he failed to meet the standing requirements of age, citizenship, and residence contained in [Section 2 of Article I] of the Constitution—requirements the House specifically found Powell met." *Id.* at 489, 89 S.Ct. at 1947, 23 L.Ed.2d at 498. After the District Court dismissed the case as nonjusticiable under the political question doctrine, and the Court of Appeals for the District of Columbia Circuit affirmed, the

---

**3.** Section 5 of Article I of the United States Constitution provides, in pertinent part:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

Supreme Court interpreted the House's "textually demonstrable constitutional commitment" to adjudicate the qualifications of its members to be limited to the "standing qualifications expressly prescribed by the Constitution," such that the House's expulsion of Powell for misuse of funds, which was not a standing qualification of office, was subject to judicial scrutiny. *Id.* at 519–20, 89 S.Ct. at 1962–63, 23 L.Ed.2d at 516.

The Supreme Court then proceeded to the merits of the case, involving whether the House had the power to expel Powell. The Court concluded, similar to its analysis under the political question doctrine, that the power to remove a member for the failure to meet qualifications of office under Section 5 of Article I was limited "to the standing qualifications prescribed in the Constitution." *Id.* at 550, 89 S.Ct. at 1979, 23 L.Ed.2d at 533. Therefore, "the House was without power" to remove Powell because he met all standing qualifications. *Id.*

We have had occasion to consider whether a political question is present in a case in *Lamb v. Hammond,* 308 Md. 286, 518 A.2d 1057 (1987), involving a contest between two candidates, John R. Hammond and Donald E. Lamb, in a neck-and-neck election for a House of Delegates seat from Anne Arundel County. While Lamb appeared to have one more vote than Hammond, the latter was declared the winner after he learned that some absentee ballots had not been counted by the Board of Canvassers and filed an action seeking declaratory and injunctive relief, and the Circuit Court, over Lamb's objection, ordered that these absentee ballots be counted. Lamb argued that the court should not have intruded into the House election process, because the House of Delegates had the "textually demonstrable constitutional commitment" to judge the qualifications and elections of its members under Section 19 of Article III of the Maryland Constitution, which provides:

Each House shall be judge of the qualifications and elections of its members, as prescribed by the Constitution and Laws of the State, and shall appoint its own officers, determine the rules of its own proceedings, punish a mem-

ber for disorderly or disrespectful behaviour and with the consent of two-thirds of its whole number of members elected, expel a member; but no member shall be expelled a second time for the same offence.

We rejected Lamb's argument. *Lamb,* 308 Md. at 304, 518 A.2d at 1066.

We opined that this legislative power to adjudicate the qualifications and elections of its members was "not unbridled," but instead limited by its express language: "as prescribed by the Constitution and Laws of the State." *Id.* A law of this State, we continued, did limit the House's sole adjudicatory authority because Section 27–10 of Article 33, Maryland Code (1957) provided that, "[a]ny candidate or absentee voter aggrieved by any decision or action of such board shall have the right of appeal to the circuit court for the county to review such decision or action, *and jurisdiction to hear and determine such appeals is hereby conferred upon said courts." Id.* at 291, 518 A.2d at 1059 (emphasis in original), quoting Maryland Code (1957), Article 33, Section 27–10. We proceeded, then, to the merits of Lamb's appeal, and concluded that the absentee ballots at issue should not have been counted because they were submitted late, under Section 27–9 of Article 33, Maryland Code (1957), and reversed the Circuit Court's judgment.

The instant removal of Jones is akin to the removal of Congressman Powell in *Powell v. McCormack,* in which the Supreme Court did not abstain from reaching the merits based upon the United States Constitution. Both Section 5 of Article I of the U.S. Constitution and Section 19 of Article III of the Maryland Constitution provide legislative bodies with express power to adjudicate the qualifications of its members; but as *Powell* and *Lamb* demonstrate, that power is limited by its very language, either to standing qualifications, under Section 5 of Article I of the U.S. Constitution, or prescription by the Constitution and Laws of the State, under Section 19 of Article III of the Maryland Constitution. The political question doctrine is narrowly applied; courts will not abstain from

reviewing actions that are not within the express purview of the "textually demonstrable constitutional commitment."

In the present case, Section 5(Q) of the Express Powers Act embodies less of a commitment to sole legislative purview than those constitutional provisions which name legislative bodies the sole judges of its members' qualifications, because there just is no commitment rendering the County Council the sole arbiter of its members' qualifications. We conclude, thus, that the issue of Jones's removal, based on his qualifications for office, is not a political question.

■ Turning now to the merits, the Circuit Court held that Section 5(S) of the Express Powers Act, known as the General Welfare Clause, provided the County Council with the authority to remove Jones from his elected seat, as an exercise of its "police power." Section 5(S) provides, in pertinent part:

> The foregoing or other enumeration of powers in this article shall not be held to limit the power of the county council, in addition thereto, to pass all ordinances, resolutions or bylaws, not inconsistent with the provisions of this article or the laws of the State, as may be proper in executing and enforcing any of the powers enumerated in this section or elsewhere in this article, as well as such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county.

Jones argues that Section 5(S) only gives the County Council power to adopt local laws, and that Bill 85–11 is not legislative in nature because it "affects Jones—and Jones alone"—and "is not a 'new law' of 'general application' that sets forth a 'new plan or policy.' "

The Express Powers Act, we explained in dicta in *McCrory Corporation v. Fowler,* 319 Md. 12, 16–17, 570 A.2d 834, 835 (1990), was enacted pursuant to the Home Rule Amendment "to transfer the General Assembly's power to enact many types of county public local laws":

> Article XI–A was proposed by Ch. 416 of the Laws of Maryland of 1914 and ratified by the voters on November 2, 1915. The Article, known as the Home Rule Amendment,

enabled counties, which chose to adopt a home rule charter, to achieve a significant degree of political self-determination. Its purpose was to transfer the General Assembly's power to enact many types of county public local laws to the Art. XI–A home rule counties. *See generally, e.g., Bd. of Election Laws v. Talbot County,* 316 Md. 332, 344, 558 A.2d 724 (1988); *Griffith v. Wakefield,* 298 Md. 381, 384, 470 A.2d 345 (1984); *Town of Forest Heights v. Frank,* 291 Md. 331, 342, 435 A.2d 425 (1981); *Cheeks v. Cedlair Corp.,* 287 Md. 595, 597–598, 415 A.2d 255 (1980).

\* \* \*

Sections 1 and 1A of Article XI–A empower Baltimore City and the counties of Maryland to adopt a charter form of local government. Section 2 directs the General Assembly to provide a grant of express powers for charter home rule counties. The General Assembly followed that directive and enacted the Express Powers Act by Ch. 456 of the Laws of Maryland of 1918, codified as Code (1957, 1987 Repl.Vol.), Art. 25A. Section 3 of Article XI–A provides (emphasis supplied):

"From and after the adoption of a charter by the City of Baltimore, or any County of this State, as hereinbefore provided, the Mayor of Baltimore and City Council of the City of Baltimore or the County Council of said County, subject to the Constitution and Public General Laws of this State, shall have full power to enact *local laws* of said city or county ... upon all matters covered by the express powers granted as above provided...."

Article XI–A "does not constitute a grant of absolute autonomy to local governments." *Ritchmount Partnership v. Board,* 283 Md. 48, 56, 388 A.2d 523, 529 (1978). This Court's decisions and the above-quoted passage make it clear that the Home Rule Amendment limits the ... County Council to enacting "local laws" on matters covered by the Express Powers Act.

Local laws, in this respect, refer to any laws that "apply to all persons within the territorial limits prescribed by the Act."

*Prince George's County v. B & O. R.R. Co.,* 113 Md. 179, 186, 77 A. 433, 435 (1910) (citation and internal quotation marks omitted).

The rub of the present case involves whether Bill 85–11 pertaining to Jones is really a "local law" or a "special law." Special laws "relate[ ] to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class," *id.* at 183, 77 A. at 434, and are enacted "for the relief of particular named parties, or providing for individual cases." *Montague v. State,* 54 Md. 481, 490 (1880).

Bill 85–11 expressly applies only to Jones and so by its very terms is a special law. Although the Circuit Court determined that the County Council exercised its police power, to transform a law that applied only to Jones into a local law, which applies to all people in Anne Arundel County, the Bill remained a special law by virtue of its lack of breadth, and the exercise of the County Council's police authority does not expand its scope.

The enactment of a special law is prohibited "for any case, for which provision has been made, by an existing General Law." Maryland Constitution Article 3, Section 33. If the General Assembly cannot enact a special law when a general law applies, then under the Express Powers Act, Anne Arundel County cannot be empowered to enact a special law where an applicable local law exists. Section 202(c) affected residency qualifications of councilmembers at the time Bill 85–11 was enacted. The County Council, therefore, lacked the authority under Section 5(S) Express Powers Act to enact Bill 85–11 to remove Jones.

■ Turning now to the centerpiece of the present controversy, members of the Anne Arundel County Council are required under Section 201(a) to reside in the councilmanic district that they represent, for six months prior to the election until the end of the term of office:

(a) **Residence Requirement.** There shall be a County Council of Anne Arundel County composed of seven mem-

bers, each one of whom, at the time of his election and for six months immediately prior thereto and during his full term of office, shall reside in a different one of the seven councilmanic districts described in Section 206 of this Article.

A second residency requirement, a qualification to run for office in Section 202(a), requires that each councilmember shall have resided in the County for at least one year immediately before the election:

(a) **In General.** In addition to the requirement of residence as provided in Section 201(a) of this Article, each member of the County Council shall be a qualified voter of the County and not less than twenty-five years of age at the time of his election and shall have resided within the County for a period of one year immediately preceding this election.

Section 202(c), which provides the fodder for the present case, provides:

(c) **Change of Residence.** If any member of the County Council during his term of office shall move his residence from the councilmanic district in which he resided at the time of his election, his office shall be forthwith vacated; but no member of the County Council shall be required to vacate his office by reason of any change in the boundary lines of his councilmanic district made during his term.

The Circuit Court concluded that "residence" in Section 202(c) meant a place of abode, as differentiated from domicile. We disagree.

For over one hundred years, we consistently have equated "residence" to domicile in constitutional, statutory, and charter provisions, unless a contrary intent be shown:

"From *Thomas v. Warner*, 83 Md. 14, 20, 34 A. 830 (1896), and *Howard v. Skinner*, 87 Md. 556, 559, 40 A. 379 (1898), until the present, this Court has consistently held that the words 'reside' or 'resident' in a constitutional provision or statute delineating rights, duties, obligations, privileges, etc., would be construed to mean 'domicile' unless a contrary intent be shown. Thus, our predecessors stated in *Howard*

*v. Skinner, supra,* 87 Md. at 559 [40 A. 379]: 'Residence, as contemplated by the framers of our Constitution, for political or voting purposes, means *a place of fixed present domicile.*' "

*See also, e.g., Garcia v. Angulo,* 335 Md. 475, 477, 644 A.2d 498, 499 (1994) (" 'resident of this State' in the [statute] ... means a domiciliary of Maryland"); *Wamsley v. Wamsley,* 333 Md. 454, 458, 635 A.2d 1322, 1324 (1994) ("We have held consistently that 'the words "reside" or "resident" in a constitutional provision or statute delineating rights, duties, obligations, privileges, etc. would be construed to mean "domicile" unless a contrary intent is shown' "); *Dorf v. Skolnik,* 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977) ("the words 'reside' or 'resident' [with regard to members of a party central committee] mean 'domicile' "); *Hawks v. Gottschall,* 241 Md. 147, 149, 215 A.2d 745, 746 (1966) (" 'a resident of this State' as used in the [statute] ... means a person who has acquired a domiciliary status in the State of Maryland"); *Maddy v. Jones,* 230 Md. 172, 178–179, 186 A.2d 482, 485 (1962) ("the Maryland decisions have given the term 'residence', for political or voting purposes, the legal significance of 'domicile' "); *Gallagher v. Bd. of Elections,* 219 Md. 192, 207, 148 A.2d 390, 398–399 (1959) (with respect to the requirement in the Baltimore City Charter that a candidate for Mayor be a resident of Baltimore City for ten years preceding the election, the Court concluded "that the framers of the Charter intended the residence required ... to be the equivalent of a 'present, fixed domicile' " and that it does not mean "an actual and physical residence"); *Rasin v. Leaverton,* 181 Md. 91, 93, 28 A.2d 612, 613 (1942) ("The requirement in the Constitution of residence for political or voting purposes is one of a place of fixed, present domicile"); *Wagner v. Scurlock,* 166 Md. 284, 291, 170 A. 539, 542 (1934) (residence in statute means domicile); *Howard v. Skinner,* 87 Md. 556, 559, 40 A. 379, 380 (1898) ("Residence, as contemplated by the framers of our Constitution, for political or voting purposes, means *a place of fixed present domicile* ").

406

*Blount v. Boston,* 351 Md. 360, 365–66, 718 A.2d 1111, 1114 (1998), quoting *Bainum v. Kalen,* 272 Md. 490, 496, 325 A.2d 392, 395–96 (1974). We have interpreted domicile as the norm in myriad and varied circumstances, including voting, *Howard v. Skinner,* 87 Md. 556, 559, 40 A. 379, 380 (1898), eligibility to run for public office, *Dorf v. Skolnik,* 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977), divorce, *Wamsley v. Wamsley,* 333 Md. 454, 458, 635 A.2d 1322, 1323–24 (1994), probate, *Shenton v. Abbott,* 178 Md. 526, 530, 15 A.2d 906, 908 (1940), and state income taxation, *Comptroller v. Haskin,* 298 Md. 681, 690, 472 A.2d 70, 75 (1984).

Only where the legislative enactment expressly reflects that residence should be defined as place of abode have we deviated from the domiciliary analysis. In *Boer v. University Specialty Hospital,* 421 Md. 529, 27 A.3d 175 (2011), for example, we were asked to interpret "residence" in Section 8–104(c) of the Estates and Trusts Article, Maryland Code (1974, 2011 Repl.Vol.),[4] which permits a creditor to file a claim, prior to the appointment of a personal representative, in the county of (1) the decedent's domicile, (2) the decedent's residence on the date of his or her death, or (3) the location of the decedent's real property or leasehold interest. We determined that residence could not mean domicile because domicile already had been referenced in another part of the statute as an alternative. *Id.* at 537, 27 A.3d at 180.

In *Cathey v. Board of Review, Department of Health and Mental Hygiene,* 422 Md. 597, 31 A.3d 94 (2011), we interpret-

---

4. Section 8–104(c) of the Estates and Trusts Article, Maryland Code (1974, 2011 Repl.Vol.) provides, in pertinent part:

*Filing with register.*—The claimant may file a verified written statement of the claim, substantially in the form contained in this subsection. If the claim is filed prior to the appointment of the personal representative, the claimant may file his claim with the register in the county in which the decedent was domiciled or in any county in which he resided on the date of his death or in which real property or a leasehold interest in real property of the decedent is located. If the claim is filed after the appointment of the personal representative, the claimant shall file his claim with the register of the county in which probate proceedings are being conducted and shall deliver or mail a copy of the statement to the personal representative.

ed the term "resident" in a regulation that limited eligibility for Developmental Disability Administration funding,[5] in a situation involving a developmentally disabled child, who lived half of the year with her father in Maryland and the other half with her mother in New Jersey. We interpreted the fact that the child was not a domiciliary of Maryland as not dispositive, because the regulation clearly contemplated out-of-state individuals for the remedial purpose of "protect[ing] individuals with developmental disability *in this State.*" *Id.* at 607, 31 A.3d at 100 (emphasis in original), quoting Maryland Code (1982, 2009 Repl.Vol.), Section 7–102 of the Health–General Article.

In *Best Drywall, Inc. v. Berry,* 108 Md.App. 381, 672 A.2d 116 (1996), the Court of Special Appeals considered whether a vacation home was a "residence" under Section 9–104(f)(3) of the Real Property Article, Maryland Code (1974, 1996 Repl. Vol.),[6] which provided that a mechanic's lien of a subcontractor "against a single family dwelling being erected on the land of the owner for his own residence" could not exceed the amount owed by the homeowner to the general contractor. The homeowners in that case did not owe the general contractor any payments, but the subcontractor, who had not been paid

---

**5.** The regulation at issue in *Cathey v. Board of Review, Department of Health and Mental Hygiene,* 422 Md. 597, 31 A.3d 94 (2011) was COMAR 10.22.12.03(B)(27), which provides:

(27) "Resident" means an individual who:
(a) Demonstrates that that individual is living in the State voluntarily with an intent to remain on a permanent basis, including children with parents or guardians who reside out of the State;
(b) Resides out-of-State but whose parents or guardians are residents of Maryland; or
(c) Is a migrant worker and, while in the State, needs medical care and is not receiving assistance from any other state or political jurisdiction.

**6.** Section 9–104(f)(3) of the Real Property Article, Maryland Code (1974, 1996 Repl.Vol.), provided:

(3) Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against a single family dwelling being erected on the land of the owner for his own residence shall not exceed the amount by which the owner is indebted under the contract at the time the notice is given.

for labor and materials, argued that a mechanic's lien could apply to the vacation home because it was secondary to the domicile owned in New Jersey. 108 Md.App. at 384, 672 A.2d at 118. The intermediate appellate court explained that Section 9–104(f)(3) of the Real Property Article was protective of homeowners by "shift[ing] responsibility for insuring payment of a subcontractor from the owner of the dwelling to the prime contractor, *i.e.,* to limit the subcontractor's ability to lien the single family residence." *Id.* at 394, 672 A.2d at 123. This general protective purpose for the homeowner lead the court to construe the term "residence" to include a non-domiciliary home. *Id.* at 395, 672 A.2d at 123.

The County and County Council seek succor in this regard from the legislative history of Section 202(c). In 1963, the Proposed Anne Arundel County Charter was drafted by the Anne Arundel County Charter Board ("Charter Board") and released to the public for consideration, along with Notes of the Reporter and Counsel to the Charter Board. Bennett Crain, Jr., Reporter and Counsel to the Anne Arundel County Charter Board, Notes to the Proposed Home Rule Charter of Anne Arundel County (1963). The Reporter's Note comments that Section 202(c) "requires that each councilmanic district shall be represented in the Council by a member who actually resides therein during his full term." *Id.* at 73. "Actually resides," the County Council contends, demonstrates an intent to require the councilmember's physical presence in his or her district and, thus, "residence" should be construed as a place of abode, not domicile.

The interpretation of the Reporter's Note must be construed in the context of the larger framework of the Charter Board's wholesale review of residency requirements for councilmembers. The residency requirements review was of extant provisions that included Sections 2–14 and 2–15 of the Anne Arundel County Code (1957), which provided the qualifications for county commissioners, then the governing body of the County. *See id.* at 72. The phrase "actually resided" appeared in Section 2–14, which required that a person must have "actually resided" in the County for at least 10 years:

A person to be eligible to the office of county commissioner shall have actually resided in the county for at least ten years[.]

Section 2–15 provided that candidates for the office of county commissioner be selected in district primary elections; to run in the primary, an individual had to be a resident of that district at the time of the primary election,[7] but there was no residency requirement during the county commissioner's term of office.

When the Anne Arundel County Charter was drafted in 1963 and adopted in 1964, district residence, as a qualification of office, was provided in Section 201(a): "There shall be a County Council of Anne Arundel County composed of seven members, each of whom, at the time of his election and for two years immediately prior thereto and during his full term of office, shall reside in a different one of the seven councilmanic districts."[8] Section 202(a) provided the qualifications to run for office: "In addition to the requirement of residence as provided in Section 201(a) of this Article, each member of the County Council ... shall have resided within the County for a period of four years immediately preceding this election."[9]

---

**7.** Section 2–15 of the Anne Arundel County Code (1957) provided, in pertinent part:

[T]he names of the persons who file their names for the position of county commissioner, in accordance with the General primary election law, shall be placed by the supervisors of elections in the county, only upon the ballot in the district where the candidate resides, and the candidate who receives the greatest number of votes in the district where he resides at the primary election shall be certified to by the supervisors of elections as the nominee of the political party to which he belongs, and the name of such nominee shall be placed on the official ballot to be used in the general election.

**8.** Section 201(a) of the Anne Arundel County Charter now provides that a council member shall reside in the district that he or she represents "at the time of his election and for six months immediately prior thereto and during his full term of office...." Section 201(a) of the Anne Arundel County Charter (2005).

**9.** Section 202(a) of the Anne Arundel County Charter now requires that a council member "shall have resided within the County for a period of

Section 202(c) and these related provisions of the Anne Arundel County Charter extended the residency qualification from candidacy to incumbency. The purpose of this district residence requirement was clearly representational, a "guarantee" that the Charter Board understood as absent from the earlier electoral scheme. Anne Arundel County Charter Board, Report to the Voters of Anne Arundel County, at xvi (1963). District residence, the Charter Board explained, would "give the voters of the County the maximum degree of district representation possible [and] insure representation on the Council for each section of the County, with its unique problems and interests. . . . The *guarantee* of district representation does not exist under the present form of government." *Id.* (emphasis in original). Thus, the Reporter's Note to Section 202(c), in commenting that the council member "actually reside[ ]" in the district "during his full term," is a reference to the previous County Code's requirement that a candidate "have actually resided" in the County prior to the election. "[A]ctually resides" does not, therefore, refer to "place of abode." Neither the express language of Section 202(c), nor its legislative purpose, thus, demonstrates any intent to vary the jurisprudential norm that the term residence is domicile.

The County and County Council, though, state that our holding in *Gallagher v. Board of Elections,* 219 Md. 192, 203, 148 A.2d 390, 396 (1959), warrants a different conclusion. Gallagher involved the eligibility of Governor Theodore R. McKeldin to run for mayor of Baltimore City after having lived in Annapolis during his tenure in office. Section 7 of the Baltimore City Charter required that a candidate for mayor must be a resident of Baltimore City for ten years immediately prior to the election. The allegation was that Governor McKeldin did not meet the residency requirement of Section 7, because he had been residing in Annapolis during his eight years in office and thereby had moved his domicile to Annapo-

---

one year immediately preceding this election." Section 202(a) of the Anne Arundel County Charter (2005).

lis, pursuant to Section 21 of Article II of the Maryland Constitution, which requires that the Governor "shall reside at the seat of government."

We interpreted "reside" under Section 21 of Article II to mean "temporary actual place of abode," *id.* at 205, 148 A.2d at 397, based upon the fact that the Governor was compelled to live in Annapolis during his tenure. We further noted that this conclusion was consistent with "the myriad of cases which hold that a change in residence or abode to enable a person to perform the duties and functions of a civil office not of life tenure, whether elective or appointive, does not, of itself, constitute a change of domicile," and not contravened by constitutional debates and proceedings, which we noted as indicating a desire for the Governor to "be available at all reasonable times in Annapolis." *Id.* at 203, 148 A.2d at 396. We, then, concluded that the residency requirement in Section 7 of the Baltimore City Charter referred to domicile, in line with our longstanding jurisprudence and consistent with the purpose of the Charter provision, to ensure that a candidate "reasonably be expected to be familiar with the business and government thereof." *Id.* at 207, 148 A.2d at 399. We determined that Governor McKeldin had not removed his domicile to Annapolis during his tenure in office and was eligible to run for mayor of Baltimore City, because he continually owned a home in Baltimore City and intended to return there after his governorship.

Accordingly, we hold that "residence" means domicile under Section 202(c). Therefore, Jones did not move his residence to the correctional facility in South Carolina, because, as the Circuit Court concluded, it is undisputed that his domicile remained in the First Councilmanic District.

 The final issue before us pertains to whether Jones is barred from bringing an action challenging the County Council's determination that he vacated his seat by the clean hands doctrine, which is a "doctrine ... intended to protect the courts from having to endorse or reward inequitable conduct." *Adams v. Manown,* 328 Md. 463, 475, 615 A.2d 611,

616 (1992) (citations omitted). "It is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this conduct. 'What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts.'" *Id.* at 463, 476, 615 A.2d at 617, quoting D. Dobbs, Remedies § 2.4, at 46 (1973).

Jones's "improper conduct," as alleged by the County Council, relates to concealing from voters during the 2010 election that he knew that he was being investigated for having failed to file one or more federal income tax returns. Jones's claim of having been improperly ousted is derived from the County Council's interpretation of the residency requirement in Section 202(c) of the Anne Arundel County Charter. Ergo, the allegations of failure to disclose are not the source of the claim that Jones was unlawfully removed from office.

Our consideration of the County Council's clean hands defense is appropriate, although the dissent challenges the sufficiency of the factual findings. The Circuit Court found that the County Council removed Jones as a result of Bill 85–11, under which a vacancy was declared because of Jones's incarceration in South Carolina, while the basis of the clean hands defense, articulated by the County Council in its Amended Response to Jones's Motion for Summary Judgment, was that Jones "withheld information about his criminal behavior and pending plea agreement with the United States Attorney" from the voters of the First Councilmanic District of Anne Arundel County prior to the 2010 election. The juxtaposition of the purpose of Bill 85–11 with the County Council's assertion in its response to the motion for summary judgment regarding the basis for its clean hands affirmative defense establishes that Jones's claim is not negated by the County's allegation.

In conclusion, we hold that the Anne Arundel County Council did not have the authority, under the Express Powers Act, to remove Jones from his seat as elected councilmember for the First Councilmanic District, and that Jones did not "move

his residence" under Section 202(c) because his domicile remained in that district. Finally, Jones's claim is not barred by the clean hands doctrine.[10]

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF A DECLARATORY JUDGMENT IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**

Dissenting Opinion by ADKINS, J., which HARRELL and BARBERA, JJ., join.

Section 202(c) of the Anne Arundel County Charter provides that, if a councilmember "move[s] his residence from the councilmanic district in which he resided at the time of his election, his office shall be forthwith vacated." The central issue, therefore, is whether Jones "move[d] his residence" when he began to serve his prison sentence in South Carolina.

The Majority bases its interpretation of the term "residence" on the theory that, unless a contrary intent is shown, the term "residence" necessarily means "domicile." *See* Maj. Op. at 404, 69 A.3d at 436–37. As a result, it is more than happy to accept Jones's "default" position—that this Court must assume that his "residence" refers to his "domicile." The Majority brushes aside arguments that it should examine the context of the Charter, ignoring direct evidence that the drafters intended that, within Section 202(c), the term "residence" would mean "actual residence."

### The Meaning of "Residence" Depends on Context

Black's Law Dictionary defines the word "residence" as "[t]he place where one actually lives, as distinguished from a

---

**10.** In remanding this case to the Circuit Court for Anne Arundel County for entry of a declaratory judgment consistent with this opinion, we do not consider any other relief sought by Jones, which is a matter for the Circuit Court to consider. *See* Md.Code (1973, 2013 Repl.Vol.), Section 3–412 of the Courts & Judicial Proceedings Article ("Further relief based on a declaratory judgment or decree may be granted if necessary or proper.").

domicile." *Black's Law Dictionary* 1423 (Bryan A. Garner et al. eds., 9th ed.2009). It goes on to explain that, *"Residence* usu[ally] just means bodily presence as an inhabitant in a given place; *domicile* usu[ally] requires bodily presence plus an intention to make the place one's home." *Id.* The Majority and countless judicial opinions state, however, that "residence" means "domicile," "unless a contrary intent be shown." *See, e.g., Bainum v. Kalen,* 272 Md. 490, 496, 325 A.2d 392, 396 (1974). Indeed, as the Majority points out, we have stated in an earlier case that "[f]rom *Thomas v. Warner,* 83 Md. 14, 20, 34 A. 830 (1896), and *Howard v. Skinner,* 87 Md. 556, 559, 40 A. 379 (1898), until the present, this Court has consistently held that the words 'reside' or 'resident' in a constitutional provision or statute delineating rights, duties, obligations, privileges, etc., would be construed to mean 'domicile' unless a contrary intent be shown." *Id.*

Upon a closer look at the cases that equated "residence" with "domicile," however, it becomes clear that—although in those cases the specific circumstances may have justified that broad statement as applied to that particular set of facts— those cases did not purport to command a firmly fixed rule for all future cases involving the term "residence."[1] For instance, in *Thomas* and *Howard,* the Court discussed "residence" in the context of voter registration only. 83 Md. at 18– 21, 34 A. at 830–31, 87 Md. at 559, 40 A. at 380–81. And, in *Bainum,* we held that the term "reside" meant "domiciled," only as used in Article III, Section 9 of the Maryland Constitution, which established eligibility to run for a seat in the

---

**1.** This is not a phenomenon particular to Maryland. As long ago as 1924, one scholar observed:

Possibly a hundred cases can be found where courts have said that residence and domicile were synonymous and a much larger number can be produced in which that proposition is denied. But this curious contradiction is more apparent than real for it will be found on examination that in the first class of cases the particular circumstances justified the statement as applied to *that state of facts* but afforded no basis for a *general* assertion.

Kossuth Kent Kennan, *Residence and Domicile,* 8 Marq. L.Rev. 222, 222 (1924).

General Assembly. 272 Md. at 496, 325 A.2d at 395–96; *see also Blount v. Boston,* 351 Md. 360, 366, 718 A.2d 1111, 1114 (1998) (qualification while serving as a member of General Assembly); *Dorf v. Skolnik,* 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977) (eligibility for office of delegate in the General Assembly); *Hawks v. Gottschall,* 241 Md. 147, 149, 215 A.2d 745, 746 (1966) (eligibility to file a claim against the former Unsatisfied Claim and Judgment Fund); *Rasin v. Leaverton,* 181 Md. 91, 92–94, 28 A.2d 612, 613–14 (1942) (eligibility to run for office of State's attorney); *Shenton v. Abbott,* 178 Md. 526, 530, 15 A.2d 906, 908 (1940) (estate probate); *Harrison v. Harrison,* 117 Md. 607, 612, 84 A. 57, 58 (1912) (determination of venue for filing a divorce). In all those cases, we arrived at the conclusion that "residence" meant "domicile" only after considering the context in which the word "residence" was used.

Our opinion in *Gallagher v. Board of Elections* provides an excellent illustration of the importance of context in interpreting the words "reside" and "residence." 219 Md. 192, 202, 148 A.2d 390, 395 (1959). That case offers an interesting interplay between two residence provisions: (1) contained within the Baltimore City Charter, and (2) found in Article II, Section 21 of the Maryland Constitution. The Baltimore City Charter provision required that a candidate for the mayor "reside" in Baltimore City within the ten-year period preceding the election. *Id.* at 196, 148 A.2d at 392. In turn, Article II, Section 21 of the Maryland Constitution requires the Governor to "reside at the seat of government" in Annapolis. *Id.* at 201, 148 A.2d at 395 (quotation marks omitted) (quoting Md. Const. art. II, § 21). The meaning of these two provisions clashed when former Governor Theodore R. McKeldin registered to run for the mayor of Baltimore City, and his certificate of candidacy was challenged because, for some time during the ten-year period preceding the election, he lived in Annapolis. *Id.* at 196–97, 201, 148 A.2d at 392, 395.

Confronted with these two provisions, we acknowledged that the words "reside" and "residence" are "susceptible of different meanings" and called them "legal legerdemains of no small

importance." *Id.* at 202, 148 A.2d at 395 (citation and quotation marks omitted). That is so because the words "reside" and "residence" are often "used to signify different things" and are known to "bear different shades of meaning according to the context." *Id.* (citations and quotation marks omitted). Thus, we stated, the term "residence"

> may mean something more than domicil: a domicil, namely, at which the party actually dwells. On the other hand, it may mean something less than domicil: a dwelling-place adopted for the time being, but without such an intention of permanent abode as to create a domicil there.... As used in a statute, the word may mean a domicil; or it may mean a dwelling-place, which lacks the legal requirements of domicil.

*Id.* (citation and quotation marks omitted).

Accordingly, in interpreting the meaning of the words "reside" in the Baltimore City Charter and Article II of the Constitution, we emphasized the importance of "the context and the purpose of the [instruments] in which they are found." *Id.,* 148 A.2d at 396. Guided by the purpose of the charter provision, we rejected the appellants' view that, as used in the Baltimore City Charter, "the word 'resident' ... means a resident in fact and in actuality as distinguished from one's domicile." *Id.* at 205, 148 A.2d at 397. We observed that "the framers of the Charter intended to set up ... a qualification for any candidate for Mayor a requirement that would reasonably assure the electorate that a candidate for such office would be familiar with the business and governmental affairs of the City." *Id.* at 205–06, 148 A.2d at 397–98. But, if "an actual and physical residence for the ten consecutive years prior to an election were intended, there would be few who would be eligible to seek the office." *Id.* at 207, 148 A.2d at 399. Thus, we concluded that "the framers of the Charter intended the residence required by Section 7 to be the equivalent of a 'present, fixed domicile,' " not actual residence or place of abode. *Id.,* 148 A.2d at 398.

We reached the opposite conclusion in "the context and the purpose of" Article II, Section 21, and we held that there the term "reside" meant "the governor's temporary actual place of abode during his incumbency in that office." *Id.* at 205, 148 A.2d at 397. We reasoned that "[b]y requiring the Governor to live in Annapolis during his term of office, the framers of the Constitution were merely seeking to insure that the Chief Executive would be available at all reasonable times in Annapolis, and to prevent the establishment of a *de facto* seat of government in the governor's 'home town.' " *Id.* at 203, 148 A.2d at 396.

"Actual residence," as opposed to domicile, was also at issue in *Boer v. University Specialty Hospital,* where we examined the word "reside" in Section 8–104(c) of the Estates and Trusts Article. 421 Md. 529, 531, 27 A.3d 175, 176 (2011). That statute permitted a creditor to file a claim with the register of wills in a county: (1) where the decedent was domiciled, (2) where the decedent "resided" at the time of his death, or (3) where the decedent's real property or a leasehold interest in real property was located. *Id.* We held that, under the plain meaning of the statute, "residence" was to be read to retain its meaning as a place where the decedent "actually live[d]," distinct from the word "domicile." *Id.* at 538, 27 A.3d at 180 (alterations in original). Thus, although the decedent's domicile was at her home in Catonsville in Baltimore County, for the purposes of Section 8–104(c), at the time of her death she "resided" at the University Specialty Hospital in Baltimore City. *Id.* at 538, 540, 27 A.3d at 180, 182.

Likewise, in *Cathey v. Board of Review, Department of Health and Mental Hygiene,* we held that under the applicable provision of the Code of Maryland Regulations ("COMAR"), "residence" was not synonymous with "domicile." 422 Md. 597, 600, 31 A.3d 94, 95 (2011). The regulation in question provided that, in order to be eligible for Developmental Disability Administration services, an individual must be a "resident of Maryland." *Id.* at 601, 31 A.3d at 96. Petitioner, who lived with her mother in New Jersey for two weeks a month and with her father in Maryland for the remaining two

weeks a month, was denied services on the residence grounds. *Id.* at 599, 602, 31 A.3d at 95, 97. When the Petitioner appealed, the Administrative Law Judge equated the term "residence" with "domicile," which finding was adopted by the Secretary and affirmed by the Board of Review. *Id.* at 602–03, 31 A.3d at 97. We reviewed the purpose of the underlying statute, however, and reached a different conclusion, finding it "inappropriate to use the restrictive domicile analysis to determine 'residence' under COMAR 10.22.12.03.B(27)." *Id.* at 609, 31 A.3d at 101. Rather, we held that "[a] better way to 'advance the remedy' here is to use a concept previously explained by this Court, defining 'residence' as the place where one 'actually lives.' " *Id.* (quoting *Boer,* 421 Md. at 537, 540, 27 A.3d at 180, 182).

Our intermediate appellate court followed the same context-based approach in *Best Drywall, Inc. v. Berry,* 108 Md.App. 381, 672 A.2d 116 (1996). In that case, the word "residence" appeared in Section 9–104(f)(3) of the Real Property Article of the Maryland Annotated Code, which prohibited placement of mechanic's liens on "a single family dwelling being erected on the land of the owner for his own residence." *Id.* at 383, 672 A.2d at 117 (quotation marks omitted). The owners in that case were residents of New Jersey but planned to use a home in Ocean Pines, Maryland as their vacation home. *Id.* at 383–84, 672 A.2d at 117–18. Relying on the legislative intent, the Court refused to treat the word "residence" as synonymous with "domicile" in that context, stating "that the legislature's intent in using the word 'residence' in § 9–104(f)(3) of the mechanic's lien law was contrary to equating it with the term 'domicile.' " *Id.* at 393, 672 A.2d at 122. The Court of Special Appeals reasoned that "§ 9–104(f)(3) clearly has as its purpose an intent to shift responsibility for insuring payment of a subcontractor from the owner of the dwelling to the prime contractor, *i.e.,* to limit the subcontractor's ability to lien the single family residence." *Id.* at 394, 672 A.2d at 123. The Court added: "had the legislature intended to distinguish between a primary and a secondary residence in parsing out the protection afforded by the statutory limitation on a sub-

contractor's ability to lien a single family dwelling, it would have explicitly done so." *Id.* at 395, 672 A.2d at 123.

The divergent views in these cases, equating the words "residence" and "domicile," on the one hand, and distinguishing them, on the other, demonstrate that there is no "default" position with respect to the meaning of the words "reside" or "residence." [2] Thus, to decipher the correct meaning of these words, "they must be construed in accordance with the context and the purpose of the constitution, charter, statute or instrument in which they are found." *Gallagher,* 219 Md. at 202, 148 A.2d at 396. Therefore, in this case, in order to determine what the word "residence" means in Section 202(c) of the Anne Arundel County Charter, this Court should have examined the context and the purpose of that provision.

### The Context and Purpose of Section 202(c)

An examination of Section 202(c) and its legislative history shows there is direct evidence that the drafters of the Charter intended the term "residence" in Section 202(c) to mean "actual residence"—evidence which the Majority fails to sufficiently explain away.

The history of the Anne Arundel County Charter is well-documented. As the needs of the county grew, several members of the House of Delegates encouraged citizens to form a "committee to petition for a charter form of government." Bennett Crain, *Government Under the Charter,* in Anne Arundel County: A Bicentennial History 1649–1977, 216 (James C. Bradford ed., 1977). That effort was successful: a committee was formed, and a charter board, "whose duty would be to

---

**2.** In his treatise on Residence and Domicile, Kossuth Kent Kennan attributed this "diversity of opinion ... in regard to the meaning of the word in different connections" to two main reasons. Kennan, *Residence and Domicile* § 6 (1934). First, statutory sources "refer almost invariably to *residence* and rarely mention domicile, thus leaving it to the courts to determine the extent to which the words are synonymous or otherwise." *Id.* Second, "questions of residence are constantly arising in relation to a great variety of subjects such as attachment, voting, divorce, taxation, jurisdiction, ... etc." *Id.*

prepare a county charter," was elected during the 1962 general election. *Id.*

The Charter Board consisted of five members and had a Reporter and Legal Counsel. *Id.; see also Report to the Voters of Anne Arundel County, in* Proposed Charter for Anne Arundel County, Maryland xiii (1963). The Board met regularly over a six-month period, in the end producing a proposed charter. Crain, *Government Under the Charter,* at 216; *see generally Charter of Anne Arundel County Maryland, in* Proposed Charter for Anne Arundel County, Maryland (1963). Section 202(c) was part of this original Charter and was ratified by the voters in 1964. *See Charter of Anne Arundel County Maryland* at 2.

When the proposed Charter was released to the public for consideration, it was accompanied by a Report prepared by the Board and Reporter's and Counsel's Notes. The Report provided "an outline of some of the major provisions of the Charter and . . . some of the views formulated by the Charter Board during the course of its studies." *Report to the Voters of Anne Arundel County,* at xiii-xiv. The Notes represented the Reporter and Counsel's "comment upon each section of the Charter, many of them actually written contemporaneously with the discussion of each section leading to the Charter as finally presented." Bennett Crain, *Notes to the Proposed Home Rule Charter of Anne Arundel County, in* Proposed Charter for Anne Arundel County, Maryland 69 (1963).

Both the Report and the Notes mentioned the words "reside" and "residence." With respect to a councilman's residence, the Report explained: "The proposed Charter establishes a seven member legislative body, each of whom must reside in a separate councilmanic district of the County, and each of whom is elected by all the voters of the County." [3]

---

3. The Board believed that

[t]he election of Councilmen by the voters of the entire County, but subject to a district residence requirement, will give the voters of the County the maximum degree of district representation possible under present law. It will insure representation on the Council for each

*Report to the Voters of Anne Arundel County,* at xv. The Notes elaborated on this residence requirement, stating that the "Board believes that the members of the Council should be both nominated and elected County-wide with the safeguard providing that each area of the County shall be guaranteed a representative residing in that area." Crain, *Notes to the Proposed Home Rule Charter,* at 72. In expanding upon the term "residence" as specifically used in Section 202(c)—the exact provision we are interpreting in this case—the Notes explained: "This section requires that each councilmanic district shall be represented in the Council by a member who **actually resides** therein during his full term." *Id.* at 73 (emphasis added).

Thus, the legislative history provides us with the exact meaning of the word "residence" as it is used in Section 202(c). The meaning of the phrase **"actually** resides" is clear. The American Heritage Dictionary defines the word "actually" as "[i]n fact; in reality." *The American Heritage Dictionary of the English Language* 18 (4th ed.2006). Black's Law Dictionary defines the word "actual" as "[e]xisting in fact; real," and contrasts it to the word "constructive," which means "[l]egally imputed; existing by virtue of legal fiction though not necessarily in fact." *Black's Law Dictionary* at 40, 356. Thus, there is only one way to read the phrase "actually resides"— the councilmember must in fact live in the councilmanic district he represents, not that he may live elsewhere but have the intent to return at some point in the future.

The Majority, however, gives short shrift to this Reporter's Note. Rather, it attempts to explain away the Note's express requirement of "actually" residing in the councilmanic district by announcing that the Note was merely referring to the

----

section of the County, with its unique problems and interests, but at the same time the Council will have County-wide responsibility and accountability for its deliberations and actions. The *guarantee* of district representation does not exist under the present form of government.

*Report to the Voters of Anne Arundel County, in* Proposed Charter for Anne Arundel County, Maryland xvi (1963).

language used in the pre-Charter 1957 Anne Arundel County Code. Specifically, the Majority focuses on Sections 2–14 and 2–15 in the 1957 Code, which concerned qualifications for running for office. Maj. Op. at 408–09, 69 A.3d at 439–40. Section 2–14 provided that, before a person could run for County Commissioner, he "shall have actually resided in the county for at least ten years." Under Section 2–15, in primary elections, candidates for County Commissioner could be placed only on the ballot of their local district.

The Majority compares these two sections to Section 201(a) in the 1964 Charter, which refers to a councilmember's residence in the councilmanic district not only "at the time of his election and for two years immediately prior thereto," but also "during his full term of office." Based on this additional qualification in **Section 201(a),** the Majority maintains that **"Section 202(c)** and these related provisions of the Anne Arundel County Charter extended the residency qualification from candidacy to incumbency." Maj. Op. at 410, 69 A.3d at 440 (emphasis added). For reasons unclear to me, the Majority apparently believes this establishes that the "actually reside" language in the Reporter's Note "is a reference to the previous County Code's requirement that a candidate 'have actually resided' in the County prior to the election." *Id.* at 410, 69 A.3d at 440.

This reasoning defies logic. It makes no sense that the Note—written in 1963, designed to accompany a specific section of the new Charter to be presented to the voters, and with the purpose of explaining the new provisions of the Charter—would somehow be translated as describing the old 1957 Code, which was about to be extinct, and which it never even mentions. Also, by its own language, the Note cannot be discussing the 1957 Code because the Note speaks of a councilmember actually residing in the district **"during his full term."** Crain, *Notes to the Proposed Home Rule Charter,* at 73 (emphasis added). As the Majority admits, under the 1957 Code, "there was no residency requirement during the county commissioner's term of office." Maj. Op. at 409, 69 A.3d at 439–40. The only residency requirement in the 1957 Code pertained to a candidate's residency **prior** to the elec-

tion. The residency requirement **during** the **full term** was introduced—for the first time—in the Charter.

Moreover, the Majority's entire effort to find the meaning of Section 202(c) within the old 1957 Code is misguided. The Majority acknowledges that the change from the 1957 Code to the 1964 Charter was a "wholesale review," but even this is an understatement. In drafting the Charter, the drafters did not revise the 1957 Code; they created a completely new form of government. Thus, the Majority's attempts to neatly line up Sections 2–14 and 2–15 of the old Code with Sections 201 and 202 of the new Charter are unconvincing. Section 202(c) is a brand new provision, which appeared for the first time in the new 1964 Charter. There is simply no section of the old 1957 Code to compare it to.

Just as unconvincing is the Majority's rejection of the "actually reside" language in the Note, utilizing a statement by the Charter Board that referred to the 1957 Code in a completely different context. Namely, the Majority relies on the Report to the Voters of Anne Arundel County, in which the Charter Board, referring to the 1957 Code, explained that "[t]he *guarantee* of district representation does not exist under the present form of government." Maj. Op. at 410, 69 A.3d at 440 (bold emphasis added) (citation and quotation marks omitted). Based solely on this statement, the Majority decides that the Reporter's Note to Section 202(c)—which is contained in an entirely different document—must also be referring to the old 1957 Code. This conclusion is unfounded.[4]

---

4. I submit that the Charter Board's elaborations on the direct representation, as "giv[ing] the voters of the County the **maximum** degree of district representation possible," Maj. Op. at 410, 69 A.3d at 440 (bold emphasis added) (citation and quotation marks omitted), directly support an interpretation of the term "residence" like that in the Reporter's Note. The best way of **guaranteeing** that each district is represented by a member residing in the district is to require that each member "actually reside" in the district. If only domicile is required, then a member may establish his domicile inside the district, but move his actual residence outside of the district and continue to live outside of the district for his entire term. This does not provide the district with

The Majority is left with a vast logical leap—between its reliance on the old Code and its attempt to explain away the Reporter's Note to Section 202(c)—which it is unable to traverse. The answer to the question before this Court lies not in the 1957 Code, but in the documents explaining the thoughts of the drafters of the Charter when Section 202(c) was first created—specifically, the Reporter's and Counsel's Notes.[5]

As explained above, these notes were "written contemporaneously with the discussion of each section leading to the Charter" and "attempt to clarify the purpose and scope of each section." Crain, *Notes to the Proposed Home Rule Charter*, at 69. The Notes were "meant to serve as a running commentary on the thoughts and conclusions of the men who were elected to study and revise the County government." *Id.* at 70. The Reporter and Counsel envisioned that "[t]he notes may also, in appropriate cases, serve an additional useful purpose to the Bench and the Bar in interpreting the Charter itself." *Id.* The Reporter's Note accompanying Section 202(c) specifically provides "that each councilmanic district shall be represented in the Council by a member who **actually resides** therein during his full term." *Id.* at 73 (emphasis added).

the **maximum** amount of direct district representation, nor does it **guarantee** that each district be directly represented by a member residing in the district.

5. We have found a reporter and counsel's notes to be a reliable source of legislative intent on other occasions. For instance, in *Yorkdale Corp. v. Powell*, one of the issues before us was the time when certain legislation became effective. 237 Md. 121, 128–29, 205 A.2d 269, 273 (1964). Like here, the Notes in that case were "contemporaneous comment" on the discussions and deliberation of a charter board—in that case, the Baltimore County Charter Board. *Id.* at 129–30, 205 A.2d at 274 (quotation marks omitted). Relying on those Notes, we held that the legislation at issue became effective forty-five days after its enactment: "The Notes remove any doubt, if the Charter provisions themselves left any, that the end of the forty-five day period was to be the equivalent of June 1 in the State legislative plan...." *Id.* at 130, 205 A.2d at 274. We also consulted a charter's reporter's notes for guidance in *Murray v. Director of Planning*, 217 Md. 381, 386–89, 143 A.2d 85, 87–89 (1958); *Renz v. Bonfield Holding Co.*, 223 Md. 34, 48, 161 A.2d 436, 439 (1960); and *City of Annapolis v. Anne Arundel County*, 347 Md. 1, 5 n. 4, 698 A.2d 523, 524 n. 4 (1997).

The Majority, as I have explained, has no valid rebuff to this Reporter's Note.

In this case, we were tasked with discovering the legislative intent behind the words "move his residence," as used in Section 202(c). In this effort, we could not have asked for a more clear pronouncement of the meaning of the word "residence" than a statement in the Reporter and Counsel's Notes, and particularly the specific Note accompanying Section 202(c) itself, that "residence" means "actually resides." Thus, I would agree with the Council's interpretation of the term "residence."

### The Council's Application of the
### Term to Jones's Situation

While this Court indeed owes no deference to the Council's interpretation of the word "residence," *see Talbot Cnty. v. Miles Point Prop., LLC,* 415 Md. 372, 384, 2 A.3d 344, 351 (2010), the Council's application of that interpretation to Jones was a "mixed question of law and fact," *Charles Cnty. Dep't of Soc. Servs. v. Vann,* 382 Md. 286, 296, 855 A.2d 313, 319 (2004), subject to review for substantial evidence, *Montgomery Cnty. v. Butler,* 417 Md. 271, 284–85, 9 A.3d 824, 832 (2010).

The substantial evidence standard of review "calls both for appellate deference and for appellate discipline. It matters not whether we think the circumstances constituted [a particular finding], so long as there was some substantial basis" supporting it. *See Tochterman v. Balt. Cnty.,* 163 Md.App. 385, 406, 880 A.2d 1118, 1130 (2005). "If such substantial evidence exists, even if we would not have reached the same conclusions ... based on all of the evidence, we must affirm." *Id.* at 409, 880 A.2d at 1132 (citation omitted).

Applying this deferential test, I would hold that, when Jones did not step foot in the First Councilmanic District (or Anne Arundel County for that matter) for five months, the Council had substantial evidence before it to conclude that Jones's "actual residence" was not in the First Councilmanic District during that time.

### Clean Hands Doctrine

I would affirm the Circuit Court's grant of summary judgment in favor of the Council and thereby would not reach the Council's defense of unclean hands. Yet, given the Majority's cursory rejection of the Council's "clean hands" argument, I am moved to address this topic.

The Majority is certainly correct in stating that the doctrine of unclean hands will only bar a plaintiff from recovering "when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim." Maj. Op. at 412, 69 A.3d at 441 (citation and quotation marks omitted). What the Majority fails to acknowledge, however, is that "[t]he clean hands doctrine is one resting in the sound discretion of the court." *Space Aero Products Co. v. R.E. Darling Co.*, 238 Md. 93, 120, 208 A.2d 74, 88 (1965). Courts are not required to apply this doctrine, but rather have discretion to do so to ensure that they do not "endorse or reward inequitable conduct." *Adams v. Manown*, 328 Md. 463, 475, 615 A.2d 611, 616 (1992). Therefore, this Court must review a trial court's decision of whether to apply the clean hands defense under an abuse of discretion standard. *Space Aero Products*, 238 Md. at 120, 208 A.2d at 88; *Hicks v. Gilbert*, 135 Md.App. 394, 401, 762 A.2d 986, 990 (2000).

In this case, the Circuit Court granted summary judgment for the Council based on its holding that Jones had moved his residence. As a result, the court made no findings as to whether it should apply the doctrine of clean hands, whether Jones's conduct was "fraudulent, illegal, or inequitable," or whether there was a sufficient nexus between Jones's alleged improper conduct and the relief he seeks in this case. *See Hlista v. Altevogt*, 239 Md. 43, 48, 210 A.2d 153, 156 (1965). Without these findings, we have nothing to review for abuse of discretion. The Majority, however, reached the merits of this issue, holding that—regardless of any facts which the trial court could find on remand—it would be an abuse of discretion for the trial court to apply the doctrine of clean hands in this case. Not only is such a holding inappropriate without the

trial court's first deciding the issue, but it is not supported by the facts. *See* Maj. Op. at 412, 69 A.3d at 441–42. I explain.

The Majority holds that Jones's alleged improper conduct (failure to disclose his legal troubles to the electorate) is not related to this litigation because "the allegations of failure to disclose are not the source of the claim that Jones was unlawfully removed from office." *Id.* In so concluding, the Majority attempts to restrict Jones's claim to his "having been improperly ousted" from the Council. *Id.* But Jones's "ouster" claim is nothing more than the vehicle by which Jones seeks to enforce his ultimate right to be on the Council, which he claims title to as the winner of the election for the First Councilmanic District seat. In this regard, the question is not necessarily limited to considering whether Jones dirtied his hands in being ousted from the Council. The Circuit Court may also consider whether Jones dirtied his hands in winning the councilman's seat, which he now claims to have a right to retain.

In answering this question, the trial court could certainly find facts that link Jones's failure to disclose the investigation and his ongoing plea negotiations with the United States Attorney to his acquiring of the First Councilmanic District seat. For example, the Council argues before this Court that Jones (1) had been in negotiations about a plea bargain for a period of "six to ten months" prior to the November 2, 2010 election; (2) won the election by a relatively small margin of 914 votes; and (3) signed his plea agreement on November 8, 2010—only six days after the election. If the trial court found these facts to be true, then it could find that Jones intended to withhold highly material facts from the public, and that he would not have won the election had he disclosed his criminal conduct. Under these facts, the trial court may conclude that Jones directly dirtied his hands in acquiring the First Councilmanic District seat—the right he now seeks to keep. A further connection between Jones's unclean hands and the ouster is that the five-month absence from his district was a direct and foreseeable consequence of his criminal conduct that he withheld from the voters. Certainly, we cannot say at

this stage—as the Majority inappropriately does—that a trial court would abuse its discretion in applying the clean hands doctrine to this case.

## Conclusion

In its refusal to properly examine the context of Section 202(c), the Majority fails to apply its own test that depends on the absence of contrary intent. It ignores the Reporter's Note to Section 202(c), which specifically states that a council-member must "actually reside" in the district. Instead, the Majority creatively constructs its own contradictory legislative history by combining irrelevant provisions of the 1957 Code with irrelevant provisions of the 1964 Charter. Ultimately, the Majority cannot get around the fact that the Note express-ly defines "residence" within Section 202(c) as meaning "actual residence." By ignoring this, the Majority has created a test, under which the term "residence" will hereinafter always mean "domicile," regardless of what the context or contrary intent may show.

Properly defining the term "residence" to mean "actual residence" under the circumstances, I would hold that the Council had sufficient supporting evidence before it to con-clude that, when Jones began to serve his sentence in South Carolina, he no longer actually "resided" in the First Council-manic District within the meaning of Section 202(c). Thus, I would affirm the Circuit Court's grant of summary judgment in favor of the Council and against Jones.

Judge Harrell and Judge Barbera have authorized me to state they join in this dissenting opinion.